[No. 7660.]

## HARRIS v. THE PEOPLE.

1. CRIMINAL LAW—*Consolidation of Informations*—Separate Informations for offenses of the same class, committed at the same time and place, and connected with each other, may be consolidated under Rev. Stat. sec. 1953.

2. EVIDENCE—*Dying Declarations*—One who has suffered a mortal wound, makes a statement of the circumstances attending its infliction, at a time when he is in his right mind, and conscious that death is certain and impending. It is reduced to writing and subscribed by him. The statement is admissible in evidence against the party whom he accuses.

3. ——*Preliminary Proofs for the Court*—The jury are not to pass upon the preliminary proofs upon which the admissibility of a dying declaration depends. The question is exclusively for the court.

4. ——*Questions for the Jury*—Where upon the trial of an indictment for murder there is evidence relevant to the issue of manslaughter, its credibility and effect is for the jury. A charge which excludes this issue from consideration is error, even though the accused has asserted upon the trial that he acted in self defense.

Information for the murder of two peace officers. There was evidence that the officers, without warrants, made entry into the house of the father of the accused for the purpose of arresting the householder. The evidence left it in doubt whether any breach of the peace or disturbance had been committed there in the presence of the officers, or at all. *Held* that the right of the officers to enter the dwelling should not be assumed, but should be left to the jury under proper instructions.

5. ——*Information for murder in the first degree*, includes all the lower degrees of criminal homicide.

*Error to Otero District Court.*—Hon. C. S. ESSEX, Judge.

Mr. LYMAN I. HENRY, for plaintiff in error.

Hon. FRED FARRAR, Attorney General, Mr. Frank C. WEST, Assistant Attorney General, Mr. JOHN W. DAVIDSON, District Attorney, Mr. A. B. WALLIS, Deputy District Attorney, for The People.

Mr. JUSTICE HILL delivered the opinion of the court:

The plaintiff in error, hereafter designated as the defendant, was convicted of the murder of J. B. Craig and Jacob A. Kipper. The jury returned verdicts of murder in the first degree, and assessed the death penalty.

Over objections the court consolidated the two informations for trial. We find no error in this respect. Both were for acts and transactions of the same class, and, for acts and transactions connected together, done and performed at the same time and place; this brought them within the provisions of section 1953, Revised Stat-

utes, 1908; the court was justified in ordering their consolidation for the purposes of trial. See *Trozzo v. The People,* 51 Colo. 323, and cases there cited.

Complaint is made to the admission in evidence of the dying declaration of Officer Kipper. The preliminary evidence for its admission discloses beyond any doubt, that he was mortally wounded; that he had been informed by his physicians that he could not live; that he fully realized this fact and so stated immediately prior to making the statement; that he made the statement in the presence of several witnesses; that it was taken down in writing, signed by him, and witnessed by them, and that he was in his right mind at that time. The declaration was properly admitted. The contention of counsel that the jury should be entitled to pass upon these preliminary questions is in conflict with our decisions, which are to the effect that they are exclusively for the court.—*Graves v. People,* 18 Colo. 170, 32 Pac. 63; *Brennan v. People,* 37 Colo. 256, 86 Pac. 79; *Zipperian v. People,* 33 Colo. 134, 79 Pac. 1018; *Weaver v. People,* 47 Colo. 617, 108 Pac. 331.

In the instructions the court defines murder in the first and second degree, as well as malice in connection with each, also, as to what constitutes murder in each degree, including the definitions of the terms wilfully, deliberately, premeditatedly and malice aforethought, etc. These, and other instructions are followed by one stating that the killing of the deceased Craig, and the fatal wounding, resulting in the death of the deceased Kipper by the defendant, are both proved and admitted, but that the defendant relies wholly upon his plea of self-defense and the defense of his father and mother, and claims that the killing was justified under the law, hence, that it constitutes justifiable homicide. This instruction, which is quite lengthy, concludes with this language:

"You are further instructed that the killing being proved, the burden of proving circumstances of mitigation or that justify or excuse the homicide, will devolve on the accused, unless the proof on the part of the prosecution sufficiently manifests that the crime committed only amounts to manslaughter or that the accused was justified or excused in committing the homicide."

The defendant tendered instructions defining manslaughter with its different degrees and the kind of verdicts to be rendered in case the jury found the facts came within the definition of such crime. These instructions were refused, to which refusal exceptions were taken and the case submitted to the jury upon the court's instructions as to what the defendant's defense was. This eliminated the question of manslaughter. In this the court erred.

The testimony, in substance, among other things, discloses that the deceased J. B. Craig was the marshal of Rocky Ford, a city of the second class; that Jacob A. Kipper was his assistant; that both were acting in such official capacity; that defendant Robert Harris and his wife were residing with the defendant's father, Joseph Harris, who with his wife lived in a little home in that city. One Boyd was the principal witness for the people. The substance of his testimony upon direct examination (which is the most favorable for the people) was, that he heard what he thought was a disturbance in the vicinity of the Harris house; that it seemed to be one of a family row; that this was about 9:30 or 10 o'clock in the evening; that it continued about three minutes; that he stood in the back part of the lot where he lived and listened a couple of minutes, maybe not so long; that he heard the noise; that they were quarreling in that vicinity; that he could not tell who it was quarreling, only as he recognized the voices; that he recognized one as that of Robert Harris; that there were only

a few words which he understood; that Robert Harris said "Shut-up;" that Joseph Harris, he took it to be, said: "This is my house, keep still;" that he heard a woman's voice but could not distinguish the words that she spoke; that the above is all the words he remembered hearing spoken distinctly; that he could hear a woman crying as though she were in distress, but did not know who it was; that he could not tell whether it was in the Harris house, on the north side of the house, or on the street; that he could not exactly locate where it was; that he went to inform the officers, who were at the depot; that about three minutes from the time he heard the noise the officers started in that direction; that he went back on his bicycle ahead of the officers but was not in a position to see anything at that time; that he was at the front part of his place; that there were three lots between; that he stepped out between the house and the sidewalk to see what was being done; that he saw the marshals enter and as they entered the house he heard some one whom he took to be Joe Harris say, "Get out, this is my house and we are peaceable;" that a large dog followed the marshals there; that he had heard what the dog would do in the way of assisting, and went up to see what was going on; that he could only see what took place in the northwest part of the front room; that what he saw first, in getting in line with the door, was the dog lunging at some one; that he could not tell at whom; that he could see Mr. Kipper and Mr. Craig, and an occasional view of a woman or some man passing between him and the marshal; that the dog had jumped two or three times at some one; that there was a cot on the north side of the room; that Mr. Kipper apparently was holding some one on that cot; that the dog was lunging at someone between Mr. Kipper and Mr. Craig; that Joe Harris came in and came around and took hold of Mr. Craig who turned, and as

he did so both of them fell over the dog; that a small dog was bothering the large one, every time he lunged the little one would bother him; that Mr. Joe Harris went down on one hand and one knee, and when he got up he let loose of Craig and grabbed hold of the big dog, dragged him to the door and kicked him out; that after he kicked the dog out the witness looked inside and Mr. Kipper was in the same position, still holding someone on the sofa; that Mrs. Clara Harris came in and had a bottle or a glass and struck some one; that he did not know if it hit any one; that Joe Harris stepped up into the door; that when he got on the second step Marshal Craig turned around and said something to him, witness did not know what it was; that at that time he saw Mr. Kipper take his left hand and throw Mr. Joe Harris from him; that Joe Harris then said, "He is going to abuse my old lady," and started for the door; that Mr. Craig shoved him out; that Mr. Kipper spoke to Craig, witness could not understand what he said as there was too much noise; that old Mr. Harris started into the house again and said, "Don't hurt my old woman;" that he reached as though he was going to take hold of Mr. Craig; that Mr. Craig struck him with his club and Joe Harris fell at witness' feet; that at that time he heard some one on the inside say, "I give up, don't hit me no more, and don't shoot;" that in ten or fifteen seconds he heard the first shot fired, followed immediately by the second, a short time a third one, then the fourth; that he left about the time the fourth shot was fired; that when he got a block from the house he heard what he supposed to be the fifth shot; that Craig was in the door when the first shot was fired; that he sank down and caught each side of the door-casing and stepped outside onto the first step, and tried to go back up; that at the third shot he stepped down onto the sidewalk; that is the last witness saw; that he could

not see Robert Harris at any time; that when the second shot was fired he could see Kipper's feet; that his head had gone against the bedroom door, and his feet extended out so that witness could see them; that the third shot came uncomfortably close to witness, and he moved and went up town to notify others; that on his return he found the neighbors gathered there, Craig lying with his head between the cement sidewalk and the board sidewalk into the house; that he met Kipper about half way in the block on the street south on his return with Ed Bailey; that when he first went after Marshals Craig and Kipper he said to them there was trouble in the Harris home; that that was his language, but the officers did not inquire what the trouble was.

The substance of the dying declaration of Officer J. A. Kipper (who lived until sometime during the 17th of July) is as follows: ''That Marshal Craig and myself were notified that there was a disturbance at the house of Joseph Harris; that Craig and I went to the Harris residence; that Craig knocked; that we opened the door and went into the front room where were present Joseph Harris, his wife Clara, Robert Harris, and his wife Annie; that Marshal Craig called upon Robert Harris to throw up his hands; that he replied that he would be damned if he would; that Craig and myself at once made for the said Robert Harris for the purpose of putting him under arrest; that we were attacked by the said Robert Harris, Joseph Harris and Clara Harris; that I caught hold of Robert Harris, and was holding him and called upon Marshal Craig to bring the handcuffs; that Craig replied he could not get to me, he being at that time in combat with Joseph Harris and Clara Harris; that while I was holding Robert Harris, Joseph Harris, who had a chair in his hand, struck me and knocked me down upon a lounge or davenport; that I was dazed from the blow and helpless; that Robert

Harris then went into the bedroom for a gun and also took from Marshal Craig his gun and shot Craig with either Craig's gun or his own; that I heard Marshal Craig say, "My God, I am shot," and saw him put his hand to his breast; that immediately afterwards Robert Harris shot me and I became unconscious, I know now that I was shot twice, but do not recall or realize the second shot; that as soon as I recovered consciousness I got up and went out into the street and was assisted by some one to the residence of Dr. Barbour; that I recollect that Marshal Craig was facing Robert Harris when Harris shot Craig; that the folks were quarreling in the house when we went there and the indications were that they had been drinking. I recall but the firing of two shots, the one that struck Marshal Craig in the breast and the one following which hit me, after that I became unconscious. I also remember of Robert Harris rushing out into the west room and returning with a gun in his hand.

There is evidence on behalf of the defendant, that there was no disturbance of any kind at the Harris home; that Robert Harris' wife had been crying upon account of something that had been said to her which hurt her feelings, but prior to the time the marshal and his assistant came they had all gone into the house; that she had ceased crying and everything was quiet; that when the officers came they entered the house without giving any notice or alarm and asked what was the matter, to which the father, Joseph Harris, responded, "Nothing, for them to get out, that they were peaceable;" that without warning or demand to submit to arrest or notice that any one was claimed to be under arrest, one of the officers first struck Clara Harris, and then an officer struck Robert Harris and then Joe Harris was struck and both officers immediately joined in beating and clubbing Robert Harris; that some one cried

out for help; that at several times Joseph Harris, the father, and Clara Harris, the mother, were struck by the officers; that Robert Harris did not resist, but that he offered to surrender and go if. the officers would quit beating him; that Joseph Harris took from the room in which the fighting was going on a revolver of his own, and went to the dining room to call Mr. Coffman, whom it appears was the mayor; that Robert followed; that the officers followed Robert; that one of the officers struck Joseph Harris, knocking him against the door; that Robert snatched the revolver from his father, tried to use it, but it would not fire; that it was knocked out of his hand by the officers, both of whom continued to beat him back into the front room; that while defendant was down on his knees protecting his head with his arms and hands from the blows he heard Officer Kipper say, "Shoot him, Craig." In the defendant's testimony he states, that he then saw his mother lying on the floor; that he did not know what had become of his father; that he looked up and Craig had a revolver pointed at his breast; that he seized the revolver; that in the tussle with Craig he turned the revolver on Craig and it was fired; that he did not have any formed intention to fire as he had had no time to think, but felt that he was going to be killed, and in the struggle immediately following another shot was fired which took effect in Craig's hip; that Craig let go of the revolver and went out of the house; that he was close to Kipper, saw Kipper in the act of firing at him; that the shot took effect as a skin wound over his eye; that at the same instant he fired two shots and Kipper sank down on the couch; that his father, having come in from the outside, and his mother, having risen from the floor, began to struggle with him to take the revolver when it was again fired out the door; that no demand was ever made upon him to surrender or

throw up his hands, or notice that he was under arrest, but that he offered to surrender.

The informations charge murder in the first degree. This includes all the lower grades of criminal homicide. If there was evidence relevant to the issue of manslaughter, its credibility and force was for the jury to consider in determining the facts and was not a matter of law for the decision of the court.—*Crawford v. People,* 12 Colo. 290, 20 Pac. 769; *Stevenson v. United States* 162 U. S. 313, 16 Sup. Ct. 839, 40 L. Ed. 980; *Henwood v. People,* 54 Colo. 188, 129 Pac. 1010.

If the evidence of the defendant and his witnesses is to be believed, it shows circumstances tending to excite a sudden heat of passion occasioned by the alleged unjustifiable and unlawful acts of the officers. Whether it is to be believed was not for the court to determine, but was a question of fact to be passed upon by the jury. The fact that the defendant may have claimed that he was acting through fear of the danger, not only to his own life, but to that of his father and mother, is not incompatible with the defense of manslaughter, nor inconsistent with the position that if his testimony and that of his witnesses is true, that the actions of the officers were sufficient to instill within him a sudden heat of passion, irresistible or involuntarily sufficient to cause him to commit the crimes alleged. This question was thoroughly considered in *Henwood v. The People, supra,* wherein at page 195 we quote with approval from *Stevenson v. United States,* 16. U. S., 313, 322, 16 Sup. Ct. 839, 40 L. Ed. 90, as follows:

"It is objected that while the evidence above set forth was proper to be submitted to the jury upon the issue of self-defense, it was not of that character to even raise an issue as to the grade of the crime, if the theory of self-defense were not sustained. We do not see the force of the objection. The fact that the evidence might

raise an issue as to whether any crime at all was committed is not in the least inconsistent with a claim that it also raised an issue as to whether or not the plaintiff in error was guilty of manslaughter instead of murder. It might be argued to the jury, under both aspects, as an act of self-defense and also as one resulting from a sudden passion and without malice. The jury might reject the theory of self-defense, as they might say the shot from the pistol of the deceased had already been fired and the plaintiff in error had not been harmed, and, therefore, firing back was unnecessary and was not an act of self-defense. But why should the other issue be taken from the jury and they not be permitted to pass upon it as upon a question of fact?''

This language is specially applicable here and demonstrates beyond any doubt, when applied to the evidence in this case, that the court was not justified in stating that the only defense claimed was that of self-defense. The defendant's counsel had tendered an instruction concerning the question of manslaughter, which, of itself, advised the court that they desired the benefit of the evidence upon this subject for what it was worth. There was testimony tending to prove that defendant acted under the influence of passion, provoked by the action of the officers, also that he acted in self-defense. Under such circumstances the rule announced in *Kent v. The People,* 8 Colo. 563, 9 Pac. 852, as well as in *Henwood v. The People*, 54 Colo. 188, 29 Pac. 1010, is applicable, which is to the effect that the defendant was entitled to have the *res gestae* laid before the jury to be considered as a whole without distinction as to which party introduced the several matters of evidence. By these statements we are not to be understood as saying that the evidence of the defendant or that of his witnesses is true or worthy of belief; it is in conflict with the dying declaration of Officer Kipper, which was

proper to be considered by the jury, although the instruction to it is perhaps entitled to criticism, a matter unnecessary to comment upon as unquestionably it will be avoided in a new trial; but, as stated in *Crawford v. The People, supra,* "Where there is an affray and where self-defense is a defense relied on, the court exercises an exceedingly dangerous prerogative in refusing to charge upon the minor as well as the graver offenses covered by the indictment." Where there is testimony which would tend to disclose the commission of a minor offense the defendant is entitled to have the jury pass on such testimony giving it such weight as in their judgment shall, under the circumstances, be proper; they might accept it as true or reject it as false; that is for them to determine; by failure to instruct on manslaughter as requested, the jury was not given the liberty to do so. This was prejudicial error.

In addition to defendant's complaints concerning other portions of it, he complains to the giving of that portion of instruction 13 hereinabove set forth. It must be conceded that it is ambiguous wherein it refers to manslaughter, when the court declined to instruct upon the question of manslaughter, thereby leaving the jury at sea as to what the word "manslaughter" meant as used in the instruction, but in view of a new trial which will permit of the defense of manslaughter we deem it unnecessary to consider this assignment or to state whether in our opinion a proper exception was taken to it.

Considerable portion of the argument pertains to the instructions concerning the rights of an officer in the alleged performance of his duties. Counsel for the state make the contention that there was no proper exceptions taken to these instructions. We deem it unnecessary at this time to enter into a discussion of either of these questions further than to state that when considered as

a whole the evidence leaves it more than doubtful whether any real breach of the peace or disturbance had been committed by anyone at the Harris home prior to the arrival of the officers, or at least that any such actions had been committed by the defendant in the presence of the marshal or his deputy. Under such circumstances the right of the officers without a warrant to enter the dwelling house of the defendant's father for the purpose of making the arrest and the making of the arrest, should not be assumed as a matter of course but should be covered by appropriate instructions stating under what circumstances officers are justified in taking such action. Counsel have filed exhaustive briefs upon this subject which disclose considerable conflict of authority; when the cases are considered in connection with the provisions of our statutes upon this subject, they will be of material assistance to counsel upon another trial in which some of these questions can be eliminated.

For the reasons stated the judgment is reversed and the cause remanded for a new trial.

*Reversed.*

Decision *en banc.*

Mr. JUSTICE WHITE not participating.