## No. 9401.

## MULLIGAN *v*. THE PEOPLE.

1. CRIMINAL LAW—*Grand Jury*—*Oath*—*Presumptions.* All presumptions are indulged in favor of the regularity of the impaneling of the Grand Jury.

Record construed to show that the Grand Jury was duly sworn.

2. RECORDS—*Amendment.* The Court has power to amend its record so as to make it speak the truth.

3. *Principal and Accessory.* An accessory may be charged and convicted as principal.

The statutory provision authorizing the punishment of an accessory as principal is not opposed to sec. 16 or sec. 25 of article II of the Constitution.

4. *Evidence.* Whatever is competent to determine the guilt of the principal is competent, for this purpose against the accessory.

A confession of the principal, though not made in the presence of the accessory is evidence against the accessory, but only to establish the guilt of the principal.

The state must show, either directly, or by conclusive circumstances that the accessory had knowledge of the principal's offense. This may be established as an inference from the facts and circumstances in evidence.

5. *Objections to Testimony.* Where there is no effort to confine such testimony to the guilt of the principal a mere objection that the testimony is hearsay, and no part of the *res gestae,* will not be regarded on error by the accessory.

*Error to Adams District Court, Hon. H. S. Class, Judge.*

Mr. M. B. WALDRON, Mr. JOHN W. GILLESPIE, Mr. GEO. Q. RICHMOND and Mr. WM. H. GABBERT, for plaintiff in error.

Hon. LESLIE E. HUBBARD, Attorney General, Mr. RALPH E. C. KERWIN, assistant, Hon. VICTOR E. KEYES, Attorney General, and Mr. WM. R. RAMSEY, Assistant, for The People.

Mr. Justice Scott delivered the opinion of the court.

THE plaintiff in error was convicted as an accessory in the robbery of one Irene Nolan. He was charged in the indictment as a principal, and as follows: "That Frank H. Mulligan on, to-wit, the second day of January, 1918, at the County of Adams and State of Colorado, did feloniously and violently take and steal one platinum ring set with one diamond about three karats, with three smaller diamonds on each side, of the value of twelve hundred dollars ($1,200) ; and one platinum ring set with 2¼ karat diamond, with one 2 karat diamond on each side of the value of twelve hundred dollars; and one platinum ring set with four diamonds, two diamonds of about 1 karat each and two diamonds of about ¾ karat each, of the value of one thousand dollars ($1,000) of the personal goods and chattels of Irene Nolan, from the person of said Irene Nolan, by force and intimidation; the said Frank H. Mulligan having then and there a confederate present armed with a dangerous weapon to-wit, a loaded revolver, which he then and there had and held, with intent, if resisted, to kill and maim said Irene Nolan."

The errors assigned and which seem important to consider, are:

1. That the defendant was indicted as a principal and convicted as an accessory. That if our statute upon that subject is capable of a construction that will permit such conviction, then the statute is in violation of certain provisions of the constitution.

2. That the grand jury which returned the indictment was not sworn as provided by law.

3. That the court admitted incompetent evidence, over the objection of the defendant, to his prejudice.

The robbery occurred at what is known as the "Model Road House," a few miles from the City of Denver, and in Adams county. This place was kept by one Jacob Feinberg. Mrs. Nolan in company with one Burke, a priest, came to the road house about two o'clock on the morning of January 2nd, 1918, and remained there occupying a separate room, but adjoining the main or bar room, eating and drinking until about six o'clock, when the robbery occurred. The circumstances of the robbery were that a man, identified by Father Burke and Mrs. Nolan, as Philip Cohen, and later convicted of the crime, came into the room occupied by Burke and Mrs. Nolan, who were seated at a table, and demanded and took from Mrs. Nolan the diamonds. These were obtained by the threats of the robber, who fired several shots into the floor. While doing this a mask which the robber wore fell from his face and the parties were from this circumstance enabled to afterward identify him. Burke and Nolan testify that some person whom they were not able to see or identify, and who was just outside the door, said to the robber as the latter went out the door, "Did you get the rocks?" The defendant was at the road house at the time, and had been drinking and shooting in the outer room shortly prior to the robbery. There was no direct testimony identifying him as being connected with the robbery. His acts and conduct, and other circumstances at the time of, before, and after the crime, were relied on for his conviction as an accessory, and if the testimony to which objection is urged, was properly admitted, these facts and circumstances were in our opinion sufficient to justify the verdict of the jury.

1. Upon the question as to whether the grand jury was sworn, it is not suggested by counsel that the lawful oath was not administered. The contention is that the record does not sufficiently disclose that the oath was administered.

The indictment itself recites, "The grand jurors chosen, selected and sworn, in and for the county of Adams, in the name and by the authority of the people of the state of Colorado, upon 'their oaths' present, etc."

The record of the court as of date of January 30th, 1918, is as follows: "At this time it is by the court ordered the roll call of grand Jurors be called and after excuses which were believed good and sufficient, the following were chosen to serve as Grand Jurors, to-wit: August Hattendorf, H. G. Newmaker, A. R. McCool, A. J. Vermazen, R. M. Cameron, John McDougal, G. F. Decatur, Parker Cline, Geo. H. Kidder, John H. Farmer, Jackson S. Cobb, Edward Mencimer.

It is now ordered G. F. Decatur be sworn as Foreman of the Grand Jury, and the remainder of the jury sworn to do its duty. Further ordered that A. M. Heineman be sworn to act as stenographer." The record further discloses that on a day, not stated, but after the verdict was returned, the following occurred in relation to the record in this particular: Mr. Johnson—We are ready to take up these two cases against Philip Cohen and Frank H. Mulligan on their motions for new trial. In reference to the record of the Grand Jury, your Honor made a statement that you would take that up and have it straightened out. The record shows that the Grand Jury was sworn, but perhaps it is a little indefinite and it should be shown. I ask that the record may be corrected to speak the truth in reference to the Grand Jury being sworn." * * *

The Court. "I have before me the records of this court, Volume 28, at page 63, wherein reference is made to the empaneling of a grand jury, and it appears from this record that the matter of the empaneling of the Grand Jury is not in accordance to the facts. The clerk is directed to make the record speak the truth in this; that the judge, himself, in open court, in this room, at the time the Grand Jury was empaneled, administered the oath to the foreman, which appears in Section 3699 under the title "Oath of Foreman," "Oath of Jurors," and in due form, according

to law, swore the foreman; and it was by reading the exact words as appears in the statute; and afterwards—immediately afterwards—each of the jurors were duly sworn by myself, according to law, and following the form set out in the section just enumerated. I think that is all that is necessary to be incorporated at this time."

It thus appears from the original record, before the order for correction, that there was a roll call of the members of the grand jury, their respective names recited, orders that the foreman, naming him, be sworn, and that the remainder of the jury sworn, "to do its duty," and that the stenographer, naming him, be sworn. While this record is brief and perhaps awkwardly written, we think under the authorities, it sufficiently shows that the grand jury was sworn as the law requires. No person of sound reason and judgment can read this record and have any reasonable doubt that the grand jury was duly sworn. But if we were to hold that the original record was not sufficiently plain to disclose the fact that the grand jury was sworn, then the court had the power to order the correction of the same so as to speak the truth, which was done.

This order was made at the same term, and while the cause was pending before the court. It was a matter peculiarly within the knowledge of the trial judge who personally administered the oath. What better and clearer showing could be made? The record is silent as to whether or not any additional showing was made. We have distinctly held that the court has such power. It was said in *Benedict v. The People*, 23 Colo. 126, 46 Pac. 637:

"The point is made that the defendant was not furnished, previous to, or at the time of, his arraignment, with a copy of the information and a list of the jurors and of the people's witnesses, as the statute prescribes. As originally made up, the record does not affirmatively show that this requirement was observed. When, however, this imperfection in the record was called to its attention, the trial court, at the same term, and upon a showing made, ordered

the record to be amended to speak the truth in this respect. The record, as now before us, shows that the statute was fully complied with in the particular mentioned. The right of the court thus to amend its own records is unquestioned, and, for aught that appears, there was abundant evidence before the court to justify the order directing the amendment to be made."

There is no suggestion of fact in the record contrary to the finding and order of the court in the matter of the amendment. In fact the original record as made, clearly justifies the order of elaboration by the insertion of the minute detail.

But the record discloses that the defendant was arraigned and entered his plea to the indictment on the 16th day of February, 1918. This plea was not withdrawn nor was there an effort made to withdraw it. It appears that there was no motion to quash, or plea in abatement filed, and the first suggestion of irregularity in the indictment, was after verdict, and contained in the motion for a new trial. It has been held by the court that in the absence of a showing to the contrary, the presumption is that the proceedings were in favor of the regularity of the record. The rule in this respect stated in *Wilson v. People*, 3 Colo. 325, seems to have been since adhered to. It was there said: "Every reasonable intendment must be made in favor of the regularity of the record. The record asserts that the grand jury of twelve men were selected and chosen according to law, but as to the particular manner of selecting them, it does not speak. We are not permitted to presume, in the silence of the record, that the court adopted an illegal method in convening the grand jury. It is said in *Chase v. The State*, 46 Miss. 697: 'A grand jury was impaneled under the supervision of the court, and the presumption is not an unreasonable one, that a legal grand jury was organized according to law,' the record not showing to the contrary. Where it does not affirmatively appear that the grand jury is an unlawful body, any irregularity in selecting and impaneling it should in

general be raised before plea, by challenging the array, and not by a motion in arrest of judgment. Wharton's Crim. Law., Sec. 469, and cases cited; 1 Bishop's Crim. Pro., Sec. 887, and cases there cited."

In determining the sufficiency of the record to show that a grand jury was regularly empaneled and sworn, this court in *Parker v. People*, 13 Colo. 155, 21 Pac. 1120, 4 L. R. A. 803, said: "By the first assignment of error the regularity of the selection and impaneling of the grand jury finding the indictments is questioned. The only record which we have before us of the proceedings in the District Court is the one made out and filed in the Criminal Court at the time of the change of venue from the former to the latter. This record, after showing that the District Court was regularly in session at the time for the transaction of general business, the proper officers being present, contains the following entries in case No. 3, 173, and substantially the same entries in each of the other cases, to-wit: *'The People, etc. v. John R. Parker et al.*, 3, 173. Burglary, etc. Be it remembered that heretofore, and on to-wit, the 5th day of February, the same being one of the regular juridicial days of the January term of said court the following proceedings were had and entered of record in said cause, to-wit: At this day come the members of the grand jury, heretofore impaneled and sworn, and present to the court here the following true bills of indictment, to-wit: *"The People, etc. versus John R. Parker, George Cushman and Charles Wilbur*, 3, 173. Burglary and larceny." Indorsed: "A true bill." Frederick J. Burton, foreman of grand jury.'" It will be noted that this record is at least no more complete in matter of detail as to the fact of the grand jury being sworn than that of the case at bar, and the court said of it: "We have, however, in this record sufficient to show that the grand jury returning this indictment had been previously impaneled and sworn under the supervision of the court, and certainly the presumption is warranted that the grand jury was organized according to law, although the pre-

liminary record is not before us. *Wilson v. People,* 3
Colo. 328." The legal presumption is that all orders of
the court made in the trial of a cause are complied with
and if not, it rests with one raising the objection to show
to the contrary.

2. That an accessory may be charged as a principal
has been expressly determined by this court. In *Noble v.
People,* 23 Colo. 9, 45 Pac. 376, the court quoted with ap-
proval the following from *Spies et al. v. People,* 122 Ill.
101, 12 N. E. 915, 3 Am. St. 320: "This statute abolishes
the distinction between accessories before the fact and
principals, by it all accessories before the fact are made
principals. As the acts of the principal are thus made the
acts of the accessory, the latter may be charged as having
done the acts himself, and may be indicted and punished
accordingly." And in *People v. Zobel,* 54 Colo. 284, 130
Pac. 837, it was said: "In this state an accessory is guilty
the same as a principal, and may be indicted and punished
as a principal." These declarations are sustained by rea-
son and authority. If accessories are under the law deemed
and considered as principals, then they are principals in
so far as the indictment, trial and punishment are con-
cerned. The authorities, where statutes similar to the
Colorado statute are involved, seem to uniformly sustain
the principle of those cited from this court.

It is urged, however, that if the statute is to be con-
strued so as to permit the accused to be charged as a prin-
cipal and convicted as an accessory, then it is in violation
of section 16, art. II of the constitution which provides
that the accused shall have the right to "demand the na-
ture and cause of the accusation against him." Further,
that it is in violation of section 25 of art. II which pro-
vides that "no person shall be deprived of life, liberty or
property without due process of law." It is plain that if
the first objection cannot be sustained, the other is with-
out merit. No case is cited and we know of none, which
in any sense sustains the contention, where the precise
or similar question was raised. It is not and cannot be

reasonably questioned but that the indictment sufficiently charges the crime of robbery in case of principal. Our statute provides: "An accessory is he or she who stands by and aids, abets or assists, or who, not being present, aiding, abetting or assisting, hath advised and encouraged the perpetration of the crime. He or she who thus aids, abets or assists, advises or encourages, shall be deemed and considered as principal and punished accordingly."

To say that an accessory is deemed and considered as principal, and to be punished as a principal, is to plainly declare that he shall be charged as a principal. All participants in the crime are made alike guilty of the crime under the statute, and therefore when properly charged with the crime, they are sufficiently advised of the accusation against them, within the requirement of the constitutional provision.

3. It is earnestly contended that testimony of witnesses Rose and Feinberg, concerning conversations with Philip Cohen, involving admissons and acts tending to establish guilt, both upon the part of Cohen and Mulligan, made after the robbery, and in the absence of Mulligan, admitted over the objection of the defendant, constitutes vital error and of itself requires a reversal of the judgment. Cohen was charged and convicted at a later date, but at the same term of court, of the identical offense, and as the principal in the perpetration of the crime. The defendant Mulligan was convicted upon the theory that he was an accessory to Cohen, in the commission of the offense. The argument is that the defendant Mulligan was charged separately, and as a principal; that there is no charge of conspiracy, and that therefore the conduct and conversations of Cohen not made in the presence of Mulligan, is incompetent and prejudicial. It appears that the robbery occurred on the morning of the 2nd of January, and the jewels were returned from a jeweler, by express, for delivery to the owner, about the 23rd or 24th day of the same month. These conversations with, and the acts and conduct of Cohen, Mulligan and the witness Feinberg, had

to do with securing the return of the jewels and clearly tended to establish the guilt of the defendant, so that if the testimony was erroneously admitted, the judgment should be reversed.

It is argued that the conversations between the witness Rose and Cohen occurred at least ten days after the crime was committed, and some of them at least, after the return of the diamonds, hence they were not only hearsay but were not a part of the *res gestae.* The argument of the attorney general is that the return of the jewels was a final disposition of the stolen goods, and until that occurred the words and acts of the defendant or either of them was a part of the *res gestae,* and therefore admissible in evidence. The defendant was tried as an accessory and whatever evidence is competent to determine the guilt of the principal is competent upon the trial of the accessory. While the accessory may under the statute be tried and convicted, independent of the conviction of the principal, yet before the conviction of the accessory may be permitted, the jury must find that the principal was guilty of the crime, and this must be determined under the rule of reasonable doubt. In this respect there has 'been no departure under our statute, from the rule of the common law. It was said by Chief Justice John Marshall in the case of *U. S. v. Burr,* 4 Cranch 469: "It is a settled principle in the law that the accessory cannot be guilty of a greater offense than his principal." The maxim is *accessorius sequitur naturam sui principalis;* the accessory follows the nature of his principal. This principle has been recognized in *Trozzo v. People,* 51 Colo. 323-337, 117 Pac. 150.

The rule of law we are discussing is stated in 16 C. J. 146, and appears to be amply sustained by authority: "In order to warrant the conviction of an accessory, the guilt of the principal must be established to the same degree of certainty as if he himself were on trial, that is, beyond a reasonable doubt."

It was said upon this point in *Turner v. State*, 124 Ga. 31, 52 S. E. 1, that: "Upon the trial of one charged as an accessory before the fact it is incumbent upon the state to prove the guilt of the person charged as a principal, beyond a reasonable doubt. The record of the conviction of the principal is conclusive evidence as to the fact of his conviction, and is prima facie evidence of his guilt. The fact that the state introduces the record in evidence does not preclude the introduction of other evidence tending to establish the guilt of the principal. Therefore, as a general rule, in the trial of an accessory any evidence which would be admissible against a principal if he were on trial, is admissible on the trial of an accessory for the purpose of establishing the guilt of the principal."

The rule as to confessions of guilt by the principal, not made in the presence of the defendant accessory, who alone is being tried, is that such confessions or admissions are admissible, but for the purpose of establishing the guilt of the principal, a necessary prerequisite before the accessory may be convicted at all, but that such confessions must be limited by the court in a charge to the jury, to the question of guilt of the principal alone. The rule in this respect is stated in 16 C. J., 146 to be: "In the majority of cases, however, which seem to be supported by the better reasoning, the broad rule is laid down that on the trial of the accessory, confessions and admissions on the part of the principal are admissible to prove the principal's guilt, provided the effect thereof is expressly limited to that object."

In a very exhaustive and instructive opinion by Judge Ramsey, in *Gibson v. State*, 53 Tex. Crim. Rep. 349, 110 S. W. 41, this distinction is clearly pointed out.

But not only was there no evidence of a confession of guilt by the principal, nor by any alleged accessory, in the case at bar, but there was no objection or motion by defendant's counsel seeking an instruction of the court to the jury, confining the testimony of the witnesses to the guilt of Cohen, alone, as principal. The objection went only to the admis-

sion of the evidence for any purpose on the ground that it was incompetent as being hearsay and not a part of the res gestae.

In the Gibson case, the defendant was charged in two counts, one as principal, and the other as an accessory in the commission of the same offense, and the court said at page 366: "If Middleton had been on trial, his detailed confession made to Holman would have been admissible in evidence against him, and was therefore admissible evidence in this case to prove his guilt as principal in the murder of Black, but not to prove that the defendant was an accomplice in that murder, or had any guilty connection with it. It was not error, we think, to admit the testimony of the witness Holman, detailing the confession of Middleton. In the charge to the jury, the purpose for which this testimony was admitted was clearly explained to the jury, accompanied by the emphatic instruction that it could not be considered against the defendant for any purpose, but could only be considered for the purpose of showing that Middleton may have killed Black. These remarks were applicable also to the testimony of the witness Christopher, detailing Middleton's confession made to him of the murder of Black. *Simms v. State,* 10 Tex. Crim. App. 131. These cases were ample authority for and in every respect sustain the action of the trial court. In this case there was no motion to require an election on the part of the State. As the case stood, in the absence of such motion to require an election, a conviction might have been had either as a principal in the murder, as an accessory or as an accomplice. Any testimony that legitimately tended to establish the guilt of the appellant under either of the counts was admissible, and where, as in this case, the jury were in terms instructed that the testimony which was admissible under the charge against appellant as an accessory, could not be considered as proof of his guilt, we can see no possible ground of complaint on the part of appellant." It is true that a conspiracy was not charged, and therefore the rule of evidence applicable to the admissions of co-conspirators as against

each other on separate trial is not involved, and for such reason the case of *Smith v. The People*, 38 Colo. 509, 88 Pac. 453, is not in point.   Conspiracy is not charged in the indictment and was not attempted to be proven in the case at the trial.

The case here is as to the guilt or innocence of the defendant as an accessory.   The rule of evidence includes as before stated, in this character of case, the admission of all proper evidence to establish the guilt of the principal beyond a reasonable doubt, but that if it include an admission or confession of guilt upon the part of the principal, the court must charge the jury that such admission or confession does not bind the accessory.   In this case the principal did not testify at all, and no witness testified as to any admission or confession of guilt upon his part.

In the trial of an alleged accessory, the state must show also by some substantial proof, either directly or by conclusive circumstances, that the accessory had some knowledge of the principal's offense.   But it is not necessary that the state should prove that there was an agreement in words or writing, between the principal and the accessory to commit the offense.   This may be established as an inference from other facts and circumstances proved.   Whether or not the testimony is sufficient to justify a conviction is for the jury.

In relation to the question as to whether or not the testimony to which objection was made, did or did not form a part of the *res gestae*, we are unable to see its applicability in this case.

The testimony of Mrs. Rose to which exception is taken, which in any sense seems to be material is, that she was a chorus girl; that Cohen frequented her apartments; that she did not meet Mulligan until after the robbery; that within a few days afterward he came to her apartment to find Cohen, and that Mulligan and Cohen were afterward in her apartment together; that the robbery was referred to frequently between she and Cohen, and that she accused Cohen of being guilty of it.   That in her apartment Cohen, when Mulligan was present, referring to Mulligan, she testified:

Q. "Well, what was said, as near as you can remember? A. Well, I heard him tell Phil that he wasn't afraid of Feinberg, because he wasn't afraid that he was going to "squeal" or say anything. Just a word now and then. I didn't pay any attention to what they had to say.

Q. Did you understand what they were talking about? A. Well, I had a good idea."

Concerning another meeting of Cohen and Mulligan, in her apartment, she testified:

Q. "Do you remember whether or not Mr. Mulligan was present after he came back? A. Mulligan came up—he wanted to meet Phil Cohen at five o'clock. The hours they met in my room had to be five or eleven, on account of my working hours. So Phil's train must have been late, and he didn't get in. I told Mulligan I would leave the key down stairs, and I left a note, and I put 'M' on for 'Mulligan', leaving the key down stairs. They were there when I got home.

Q. When you got home—was that after the last show, about eleven? A. Yes, sir.

Q. Did you hear any talk at all between them after you got home about what had taken place? A. Why, yes, I heard Cohen say something about the Grand Jury, and what they had said; but I don't know just exactly what his statement was.

Q. Not exactly, but can you give me generally? A. He just said, 'They are trying to make me the "goat" ', is what Phil said.

Q. What did Mulligan say? A. I didn't hear him say anything. I guess he did say something, but I don't know what he said."

Certainly this testimony is not subject to objection for any reason. The specific testimony by Mrs. Rose, set out in the brief as being prejudicial to the defendant Mulligan, is in substance as follows:

"How long was it after the hold-up before you ever spoke to Cohen about it? A. Well, I spoke to him every day about it.

Q.  Every day beginning how soon after the hold-up?
A.  Oh, about ten days, I should judge.

Q.  Was that before the diamonds you heard—the diamonds were returned?    A.    That was before.

Q.  What did Mr. Cohen say to you when you asked him about it?    A.  Well, Mr. Johnson, you understand that Cohen did not tell me anything about the diamonds until after they had been returned.

Q.  I understood you to say that you had a conversation with him before that time, when you saw him around with Mulligan?    A.  No, I merely asked him questions, I accused him of the robbery, of being in the robbery, and one thing and another.

Q.  When you said that to Mr. Cohen, what did he say in reply to it, speaking about the first time, if anything?
A.  Oh, sure, I am the man, he said.  Everybody on the market thinks I did it, too.  My conversation that I held with Cohen you will understand, was after the diamonds were sent back.

Q.  You mean the conversation in which he described in detail?    A.  Yes, sir, that is what I mean.

Q.  Well, was that after you heard they were returned, or how do you fix that?    A.  After they were returned, after I heard they were returned, then he told me the details.

Q.  Do you remember any conversation with Mr. Cohen about there being some negotiations going on between Mr. Cohen and others to have these diamonds returned?    A.  I did not hear anything about it before they were returned, no, nothing.

Q.  Didn't you hear the name of Feinberg mentioned?
A.  No.

Q.  All these matters that you have testified to here were after Mr. Mulligan had been arrested?    A.  Yes, I do.  I remember Phil came to my room, and he had left his old hat at my room and he told me—and he said, 'I am going to the Springs to see about putting in a new store there, and, he says, 'I am going to drive the car; let me have my old

hat.' I took the old hat and placed it in the suitcase. He came back shortly. He said, 'I decided not to take the store; it was too much rent.' "

In all this testimony there does not appear to be a word or act reflecting on Mulligan at any time when he was not present. If it had application it was to Cohen alone, and was competent. The guilt of Cohen was necessary to be established on the trial.

In order to consider the alleged incompetent testimony of Feinberg, the proprietor of the roadhouse, it seems important to refer to some of his evidence to which specific objection in the briefs is made.

He testified that Mulligan, the defendant, who was a city detective, came to the roadhouse about one thirty o'clock in the morning with a party of others in an automobile; that Mulligan was drinking and fired shots in the bar room. That he, Feinberg, left the place for the city with waiters and entertainers, at about five fifteen o'clock, and invited Mulligan to go with them but who declined for the reason that he would not ride with "niggers", and that they left Mulligan lying on a bench. That Burke and Mrs. Nolan were still in the small dining room, and two or three of the help still remained at the roadhouse.

He says that after the robbery he, Cohen and Mulligan met every day or every other day. That upon one occasion Mulligan drove him out to the end of a car line where he had an appointment to meet Cohen—that Cohen was at the designated place when they arrived. That on the same day he asked Mulligan if he knew anything about the diamonds and who replied that he did not. Mulligan said, "Why don't you go and see Cohen and 'Dip' and see if they know anything about it." I did see Cohen next morning out at "the end of the prairie." It was about five o'clock the same evening when he and Mulligan met Cohen at the end of the car line.

At this meeting witness said to Cohen that he wanted to get the stuff—Cohen said he thought he knew where to go and get it. I told him they would get immunity if they would get it and he told me he would talk to this party, and

he thought it would take about a hundred dollars to get it, and said there must be no publicity and the diamonds will be returned.  I told him I did not want to know who did the holding up.  He said I think the stuff can be gotten back if there would be no prosecution, no publicity, and nobody know when the diamonds would come back.

When I told Mulligan that if the diamonds could be "blowed back" his prosecuting witness might fail to identify anybody, he said "it would keep us out of trouble."  The witnesses, Mulligan, Cohen, Sidney Evans, "Dip" Evans, and "Chalk" had at the time, all been arrested for the crime. Feinberg further testified that he gave Cohen three different addresses, where the diamonds could be returned.  The diamonds, it appears, were returned to one of these addresses by express from Pueblo—Witness gave Cohen ninety dollars to get the stuff "blowed back."

The above is the substance of the testimony of Feinberg, to which objection was made.  Plainly it was competent as against Cohen, and therefore admissible.

We find no error in the admission of the testimony of the witnesses Rose and Feinberg.

Counsel in their brief say:  "It will be noted from an examination of the record that the conversations between these witnesses, Rose and Feinberg, with Philip Cohen, relative to the robbery and the diamonds which were obtained as a result thereof, were all prior to the disposition of the diamonds by the robber."  We are unable to see what difference it can make in this case when these conversations took place, as related to the time when the diamonds were returned.  The charge was robbery, and the crime of robbery was complete when the diamonds were taken, regardless as to whether or not they were ever returned.  Any proper evidence tending to prove the guilt of the defendant is not to be excluded because of the time of an after occurrence tending to show guilt, but not connected with the immediate perpetration of the crime.

It is argued that there is not sufficient testimony in the case to justify the jury in connecting the defendant with

the established crime.   The testimony so far referred to, is but a part of the showing made by the people, and it is not our purpose to refer to much of it, except to express the opinion that upon the whole, the evidence was sufficient to submit the question of guilt or innocence to the jury.   But the following detailed circumstance is one among others tending to establish the guilt of defendant.   It will be remembered that Mulligan arrived at the roadhouse about one thirty in the morning.   The following is the substance of the testimony of one J. H. Cordillo:   "Name is J. H. Cordillo, reside at 1316 Elati street, Denver; have charge of the prohibition department for the State; have known Frank Mulligan for the last six or eight years; been around him for the last fourteen or fifteen months; business required me to be at City Hall; was at Model Roadhouse January 2nd, arrived there a little after three o'clock—about three thirty; Mulligan and another party went with me; other party drove the car and wore a brown overcoat; the collar was up; he had on a black, soft Fedora hat, creased in the center; did not speak with him; just before going there was at home; somebody rapped at the door a little before three o'clock; my wife went to the door; later I went and met Frank Mulligan; he came in.   He said to me when he came in, 'hurry up and get your clothes on right away.   There's a whole load of booze out to the Model.   I just came from there; let's go and get it.'   I told him to wait in the front room, and he followed me through the dining room, and I went in the bed room and sat at the foot of the bed.   He kept walking back and forth, and he kept saying, 'Hurry up.   You are too slow.'   I dressed, put my shoes on, and he says to me, 'Well, now, hurry up, or it will be too late.' And I hardly had time to lace my shoes.   We went out and got in the car; the man whose clothes I have described drove the car; Mulligan and I sat in the back end of the car. On the way going out there, as this fellow was driving the car, Mulligan kept telling him, 'Can't you make more speed? Step on her.'   First I thought he mentioned a fellow's name —'Chalk'.   He might have said 'Chalk'.   I didn't pay much

attention to the name.  As we got to the crossing, where the Burlington crosses the Brighton road, he says to me, 'Father Burke and Mrs. Nolan are out there, and they are drunk.  I didn't pay much attention to that.  We went a little bit farther, and he repeated the same statement.  Just before we got to the place, as we crossed the Union Pacific tracks, that is, between the Model and the Sand Creek bridge, he suggested to me that I should go in and 'Pinch' the place.

Q.  What did he say to you?  A.  'Now, you go in.' he says, 'and 'pinch' the place, and there's a party that will do the 'squaring' and we will get the 'rocks.'

Q.  Had he said anything about 'rocks' before that?  A. If I recollect right, I believe he did.  He said that Father Burke and Mrs. Nolan were covered with 'rocks' when he first mentioned Mrs. Nolan.  *  *  *  This fellow, whoever he was, driving the car, turned around and drove practically parallel with the building; the driver of the car, whoever he was, jumped out of the car and went in the front door where the bar room is; Mulligan went in the side door on the north side of the building, underneath the stairway, which leads into a wine room, I believe it is; and I went out and searched this car that was across the street, thinking there was a load of booze there yet.  I went back towards the back end of the building, and I heard Feinberg and Mulligan talking at the rear.  The only word I could understand was who said it, I don't know, 'Oh, damn you, you're crazy,' or something like that, and he walked out the side gate and walked towards me.  He says, 'Hello there.'  I says, 'Hello, Jake.'  He says, 'damn it, that God damned fool is crazy. He's drunk.'  This conversation was with Feinberg after he had left Mulligan; Mulligan had gone back into the building again; did not see Mulligan again that evening; did not go into the place; I came back to Denver with one of the Evanses; I couldn't say which one it was.  I got back to Denver about four o'clock."

And on cross-examination:

Q.  Was Mulligan drunk?  A.  Well, he had been drinking, yes.

Q. Was he under the influence of liquor when he was talking to you? A. Well, not so awful much. He had· been drinking. I don't know how much he had been drinking. . You could smell it on him and tell from his actions. * * * He didn't tell me until we got right near the place to 'pinch' the place. I did not 'pinch' the place. Just as I was leaving I heard two shots fired in the building somewhere, just after we hit the main road. I came back with Evans—I don't know what his name is—John or 'Dip'. It is the fellow that acted as chauffeur. Jake Feinberg told him to take me in. I asked Feinberg to get me away from there. There was five automobiles out there. I did not search all five. I did not tell anybody about this affair until Chief Armstrong called me into his office a few days after it occurred."

We find no errors of law occurring upon the trial and the judgment is therefore affirmed.

*Judgment affirmed.*

*En banc.*

Teller, J. and Bailey, J. dissenting.