No. 13,588.

PACHECO ET AL. *v.* THE PEOPLE.
(43 P. [2d] 165)

Decided March 25, 1935.

Mr. L. R. TEMPLE, Mr. CHESTER A. BENNETT, for plaintiffs in error.

Mr. PAUL P. PROSSER, Attorney General, Mr. WALTER F. SCHERER, Assistant, for the people.

*En Banc.*

MR. JUSTICE HOLLAND delivered the opinion of the court.

PLAINTIFFS in error will be referred to as defendants. On March 30, 1934, in the district court of Weld county, they were tried upon an information charging them with having murdered one Clifford Smith on February 27, 1934. The jury returned a verdict finding each guilty in the first degree and fixing the punishment at death. After the overruling of a motion for a new trial, and on April 9, 1934, sentence was passed upon the verdict by the court and defendants assign error.

The facts established by the people are in brief: That the deceased, Clifford Smith, together with his wife Violet Smith and Bobby Griffin, a 16-year old boy, were

living on a farm near Wellington, Colorado; that prior to February 27, 1934, the defendants had worked for the deceased and were known to the Smith family; that the defendants are of Spanish-American descent and lived with John Herrara, a brother-in-law, in Wellington; that on the evening of February 27, Smith and his wife attended an entertainment at the school house in Wellington, and on account of a slight illness, the boy Bobby, was left at home alone; that the Smiths returned home about 9 o'clock, Smith entered the house and Mrs. Smith heard a shot and started to run away, when the defendants came out of the house and shot her; that immediately thereafter believing her to be dead, they carried her into the house, laid her on the floor and one of the defendants viciously attacked her person; that kerosene, apparently from a lamp on the living room table, was scattered over the inside of the house and the clothing of Mrs. Smith, and then set on fire; that defendants fled to their home, and defendant John told their brother-in-law, he had killed Smith; that defendants took some clothing and left; that on the day following, they were apprehended where they had been seen hiding in a hay stack, and upon being brought to Denver to escape apparent mob violence, were questioned by officers of the Denver police department, and, as shown by the evidence on the part of the people, made confessions which were reduced to writing, submitted to them and signed by the defendants in the presence of witnesses, which confessions, after the overruling of objections by the court were admitted in evidence as voluntary confessions. These confessions, supported in many details by the people's witnesses and the testimony of defendant John Pacheco, disclose a brutal and sordid crime, the substance of the principal details of which are as follows:

Louis Pacheco stated in his confession that he and his brother John, arrived at Smith's home about 7 o'clock in the evening; that they went there because he, Louis, wanted to get some money that he had worked for cutting

corn for which he had asked Smith several times; that he had quarrelled with Smith about it; that no one except himself and Smith knew that Smith owed him; that he had a 22 revolver in his pocket; that when he arrived at Smith's house, Bobby Griffin let them in and he inquired of Bobby where Smith was, and was told that he was over at the school house; he then asked Bobby if he had a bigger gun and when Bobby said no, he told Bobby to go through the drawers and trunks and look for a bigger gun; that Bobby looked out and, seeing Mr. and Mrs. Smith coming in their car, attempted to get away, whereupon Louis shot Bobby in the head; that his brother John did not see him shoot Bobby; that he shot him to keep him from going out to give an alarm to the Smiths; that in about five minutes Smith came in the house. Louis further stated in his confession: I asked him for my money and he said he didn't owe me anything and wasn't going to pay. I shot once and the shot glanced off and hit John, my brother, and then John shot Smith twice. Mrs. Smith, who was still out in the yard, started hollering. I slipped out of the door, John followed me and I shot her. She fell down, and we took her into the house, threw a blanket over her, and I saw John pour coal oil on them. John lit a cigarette and threw the match down and the fire was started. We left and started home, but John left me before we got home. I threw my gun away quite aways from the place.

The confession of defendant John Pacheco stated the same time of arrival with his brother at the Smith home as that fixed by Louis; the finding of Bobby Griffin there; that they had been in the house about an hour before Bobby was killed; that Louie told him he killed Bobby; that while waiting for Mr. and Mrs. Smith to return, he searched the drawers and ransacked the place; that Mr. Smith came in first. The confession then continues: I said to him, "Did you turn me in on account of a calf, I want to fix it up, so he said we are going to settle it by shooting, so I grabbed that gun, and shot." I didn't see

any gun in Smith's hand. Louie was in the kitchen. I shot Smith twice and left him lay there and after that I saw Louie shoot Mrs. Smith who was out in the yard, and the two of us carried her into the house. I then lighted the lamp and threw the oil on the floor and on Mrs. Smith, but before that saw Louie lift up her dress. I did not rape Mrs. Smith and did not see Louie rape her. I then struck a match on the floor and went home. I didn't go all the way home, I went back to see if anybody was there, and found two of them, Bobby and Mr. Smith on the floor. I threw the gun away by the water tank, it was a 22 rifle that was in Mr. Smith's house. I then went home and told Louie that Mrs. Smith had left the house. We then went up to the hay stack. I threw the match on the floor and tried to burn the house.

Defendant John Pacheco testified in his own behalf. When interrogated concerning the confession he had made, he was uncertain, evasive and when pressed, could not remember. He admitted the shooting but denied the attack upon the person of Mrs. Smith and said that when Smith came in the house and was asked for the money and refused, he then picked up an iron (which the witness could not describe in any manner), and started to strike him with the iron when his brother, Louis, shot Smith. Smith then got up and started to strike Louis with the iron and he, to protect his brother, then shot Smith.

Mrs. Smith testified for the people and detailed the tragedy as it occurred after she and the deceased reached home. She testified that her husband went into the house, she heard a shot and the defendants, who were then recognized by her, came out of the house, shot her and in the fear of further violence, she feigned death, and was carried into the house. She described the attack upon her person in detail, and stated that while in her then condition she was kicked in the head and face. She related the events of the setting fire to her clothing and the escape of the defendants; of the putting out of the fire in her clothing, and, fearing that the defendants were outside the

door, she crawled out through a window and fled to the house of a tenant on the farm. The defendants were known to her. She identified them at the time of the tragedy and at the trial.

Counsel for defendants assign numerous errors, many of which are without merit. For reversal, they seem to rely upon the refusal of the court to give tendered instructions upon the crime of voluntary manslaughter, and giving of the instruction by the court charging accessories as principals.

■ Considering the connection of each defendant with the entire crime as disclosed by the evidence, and especially the confessions voluntarily made, and so held by the court, and under the statutory definition of accessories, both defendants were principals and their relation to the commission of the entire crime was such that from the accessory standpoint, they could be and were properly charged as principals in the information. On numerous occasions, this court has held that an accessory may be charged as principal. There is no statutory distinction between accessories before the fact and principals. *Mulligan v. People,* 68 Colo. 17, 189 Pac. 5; *Voris v. People,* 75 Colo. 574, 227 Pac. 551. An accessory during the fact may be charged in the information as principal. In this case, it is beyond question that there was concerted action between the defendants for the accomplishment of a common purpose to commit and complete the crime. In such circumstances there was ample justification for charging them as principals in the information.

■■ The court properly refused to instruct the jury on the degrees of manslaughter for the reason that the evidence in this case shows the killing of Smith to have been intentional and deliberate, and there is no question of manslaughter presented. Counsel for defendants argued that the testimony of John Pacheco was sufficient to justify, if not require, the submission of an instruction as to the effect of his testimony. The only evidence in this case, which would justify such contention is the following

portion of John Pacheco's testimony: "He (Smith) walked to the dining room and came back * * * I don't know what he said * * * he was arguing about that money with my brother, and he told him that he was going to pay him up in some other way, so he took an iron or something, and he was going to hit my brother, and he looked toward where I was and he seen me, and he was going to hit me with that iron, and so my brother shot him and then he got up again and went to hit my brother, and of course I had to defend my brother so I shot." This alleged attack upon his brother, as related, does not indicate a provocation sufficient to create irresistible passion. It was not a provoking injury upon the killer. The evidence discloses a deliberate intention on the part of defendant to do the thing that was done. Under rigid cross-examination, he was wholly unable in any manner to describe the iron to which he referred, and his testimony was generally contradictory, uncertain and displayed a convenient failure of memory when he was called upon to relate important details surrounding the admitted killing and the giving of his confession. His testimony, viewed in the light most favorable to him, does not change the effectiveness of the following simple statement of adverse facts. Giving full faith and credit to the statement in the confessions and the testimony, that the going to the deceased's house was upon a lawful errand, to collect money, this lawful mission terminated in the unprovoked, malicious and brutal killing of Bobby Griffin prior to the return of deceased. It is clearly apparent from the record that upon the arrival of Mr. and Mrs. Smith, Mrs. Smith observed someone in the house, called to Bobby and received no response; that she then requested her husband not to go in, this request was unheeded, and Smith entering the house, found the two defendants in the kitchen, standing about six inches apart with guns in their hands, and he saw a lighted lamp in the bedroom. The tragedy soon sealed Smith's lips, what else he saw, we do not know, but feel that we are justified in the presumption,

that if there was sufficient light in the room for the defendants to see that Smith had no gun as they stated, and to see him pick up an iron, as they testified, we then assume that it was light enough for Smith to see two men in his house under the unaccounted for and unusual circumstances above mentioned, and seeing them armed, we must say, that the law would have justified him in taking any reasonable means to defend himself and his castle, even to the extent, if necessary, of taking life.

At this point, assuming the truth of John Pacheco's testimony, that deceased picked up an iron for any purpose, and was attempting to use it on John when Louis shot him, and that he then started to attack Louis, his assailant, when John shot and killed him, we must say that the deceased, after being shot by Louis, had a right to defend himself against a further attack from the latter, even to the extent of taking his life if necessary, and if John killed him while he was so engaged in a lawful defense of himself as against the attack of Louis, for which Louis could claim no provocation after having shot deceased in the first instance, then John was in no better position to claim provocation. A crime already having been committed by defendants acting in concert, with no evidence to negative a felonious intent, the law superadds to the original felonious intent, the intent to kill the deceased. *People v. Olsen,* 80 Cal. 122, 22 Pac. 125. The entire crime was the result of wickedness of heart, cruelty and recklessness of disposition. If there was passion in the mind of John at the time of firing the fatal shot, it was without lawful provocation, because whatever deceased did, from which provocation could be claimed, was done under the compulsion of the accused and his partner in crime. Having placed themselves in this position, we are compelled to say, as a matter of law, that they forfeited all right to claim provocation, and to mitigate a homicide from murder to manslaughter, upon which defendants' claim the court should have instructed the jury, there must have been adequate provocation. One cannot strike to

relieve his brother from peril, unless the latter is free from fault in bringing on the difficulty which placed him in peril. *Gibson v. State,* 91 Ala. 64, 70, 9 So. 171.

■ It cannot be said, from any view of the evidence, that Smith was at fault. Taking his life under the circumstances, was malicious. The judge was an integral part of a mixed tribunal, that of judge and jury, and we must assume from his refusal to give the tendered instruction, that under the circumstances, applying the law to the facts of the case, he failed to find any evidence that would support the giving of an instruction on voluntary manslaughter. There was no error in such refusal.

It is unnecessary to discuss other assignments of error which we do not believe to be well taken.

The judgment is affirmed, and it is ordered that defendants be executed during the week ending June 1st, 1935.

MR. JUSTICE HILLIARD authorizes me to say that he concurs in this opinion, except he believes that as to defendant John Pacheco, the younger man, the evidence justified his request for an instruction on manslaughter.

MR. JUSTICE BOUCK dissents.

MR. JUSTICE BOUCK, dissenting.

From the majority opinion I dissent. What I shall say will be said as if John Pacheco were the sole defendant. My reason for dissenting is that the trial court refused John's request to instruct the jury in regard to manslaughter.

A brief and dispassionate recital of the main facts may not be amiss.

John Pacheco, the defendant, 25-year-old Spanish-American, dropped in at Clifford Smith's home near Wellington in Larimer county, Colorado, on February 27, 1934, with Louis, his elder brother, aged 37. He did not know any reason for the trip except that he and Louis were out to hunt rabbits or coyotes. He had a 22 rifle be-

longing to a young brother; Louis had an old single shot pistol.

A boy named Bobby Griffin lived at the Smith house. He was there alone when the two brothers arrived. The Smiths were absent, having gone to attend a school entertainment. John went some distance from the house on a legitimate errand. There had been no trouble of any kind and nothing unusual when he left the house. He returned. In the meantime Louis had shot Bobby, but it does not appear that John knew this until after the entire series of tragedies was complete.

Smith entered his house a few minutes later. What happened immediately thereafter, including the killing of Smith, will be dealt with later.

After the killing of Smith, the brothers came out of the house, Louis ahead of John. Mrs. Smith, who, when she and her husband returned, had noticed that somebody was inside, remained outdoors. Smith himself went in. She heard a shot within, turned and ran away. Louis shot her. She subsequently recovered and was a witness at the trial. Except in connection with the killing of Smith inside the house, John fired no shots. Whether John saw his brother shoot Mrs. Smith is not certain. He helped Louis carry her into the house.

It is uncontradicted that the shooting of Bobby was done out of John's presence and without his knowledge; also that Mrs. Smith was not shot by John, but by John's brother. These two shootings respectively preceded and followed the shooting of Clifford Smith.

I now revert to the killing of Smith. Under all the evidence, this killing—so far as *John* is involved—was an entirely separate transaction from the others.

What is the evidence adduced in relation to this transaction?

For the sake of the present discussion I concede at the outset that there is substantial evidence tending to prove both John and Louis to have committed upon Clifford Smith murder of the first or second degree. On the other

hand, does any of the evidence tend to support the theory of John's attorney that John's killing of Smith was manslaughter? If it does, then there should have been applied in favor of John the principle laid down by this court in the case of *Jabich v. People,* 58 Colo. 175, 143 Pac. 1092. See also: *Crawford v. People,* 12 Colo. 290, 20 Pac. 769; *Harris v. People,* 55 Colo. 407, 135 Pac. 785.

What, then, was the evidence that would tend to show the Smith homicide was not murder, but possibly manslaughter?

John's own testimony regarding what occurred between him and Smith is in substance as follows: "* * * * On the way home * * * we [John and his brother Louis] just come into Smith's house * * * so when Smith come in, so my brother said to him at that time, about getting a little money for this work he done [Louis had admittedly worked for Smith] * * * Cliff said 'Why, I don't believe I can give you no money,' he said, and then he said 'How about that calf of mine that you butchered,' and so at that time, my brother said, Well, he said 'I don't want no trouble at all' and so he talked over some more about that money, and so pretty soon Mr. Smith got an iron piece there, and he was going to hit brother, I was standing on the side and so then he turned around to hit me with that iron and so brother shot at him, and so then he turned around and went to hit brother again and so I was going to defend my brother because I had to, and so I shot him too * * *."

The people's evidence shows clearly that Smith lay dead on the floor with his arms outstretched. Not one iota of evidence contradicts the story of John about the iron. The position of Smith's body seems to corroborate John. But, corroborated or not, the testimony of John is in the record. Whether it was true or false is a question that was for the jury to decide, upon proper instructions as to the law. The omission of the manslaughter instruction, which would have enabled the jury to consider this defense, thus

amounted, I think, to a denial of the fair trial to which John was entitled.

"No matter how improbable or unreasonable the contention, defendant was entitled to an appropriate instruction upon the hypothesis that it might be true." *Jabich v. People, supra,* at page 179 of 58 Colo., and page 1092 of 143 Pac.

It is not denied or doubted that, if John's testimony is true, John's admitted killing of Smith is not murder, but voluntary manslaughter. This is familiar law. Compare *Edwards v. People,* 73 Colo. 377, 215 Pac. 855, where this court held that a conviction of manslaughter in a similar situation was proper.

The question is a question of fact. As such it should have been submitted to the jury in the district court. The refusal of the tendered manslaughter instruction was, I think, prejudicial error. In view of this, I cannot join in approving the death penalty imposed upon John Pacheco, and respectfully dissent.