## No. 12,418.

### WEISS v. THE PEOPLE.
(285 Pac. 162)

Decided February 3, 1930. Rehearing denied February 24, 1930.

Mr. Frank E. Hickey, Mr. Paul D. Shriver, for plaintiff in error.

Mr. Robert E. Winbourn, Attorney General, Mr. Sidney P. Godsman, Assistant, for the people.

*En Banc.*

Mr. Chief Justice Whitford delivered the opinion of the court.

Plaintiff in error was charged with murder in the first degree, for killing his wife. He was convicted, as charged in the information, and sentenced to be hanged. To review that judgment he prosecutes this writ of error.

Because of the gravity of the charge, and the insistency of counsel on oral argument and in their briefs, that the evidence at the trial was insufficient to sustain the verdict, we have read with painstaking care, all the evidence brought up by the bill of exceptions, and, notwithstanding counsel's contention, we find from our examination that the evidence is ample to sustain the verdict and the judgment. We think the jury would have failed in the performance of its duty had it found otherwise than it did.

The record shows that the defendant is a Roumanian by birth. He grew from childhood to maturity in New York City. There he married the deceased. Four children were born of that marriage. The domestic life of

the defendant and the deceased was one of constant discord. He said he did not love or care for her. He was unfaithful to his vow of fidelity, and contracted a loathsome venereal disease. At times the members of the family were objects of charity. Two divorce suits were instituted as a result of their domestic discord. The last one was still pending at the time of the homicide. In the pending suit the defendant was ordered to pay his wife temporary alimony. On the day of the homicide their three living children were charity patients in a hospital. His wife was out of work, and in need of money. On the day of her death she called at the office of Mr. Spaulding, her attorney, with reference to the unpaid alimony. Thereafter she visited the place of business of the defendant, on East Colfax avenue, and asked him to pay the back alimony. He grew angry, and left the place. On his return, after her departure, he answered a telephone call, left for him during his absence, which proved to be a call from Mr. Spaulding, the attorney for Mrs. Weiss in the divorce suit. Spaulding informed the defendant that Mrs. Weiss had been to see him that day about the payment of the back alimony. The defendant testified that he became very angry, and screamed at Spaulding, over the telephone, at the top of his voice, and said to him "that he did not want a thing more to do with that gypsy," and, "that any man who would represent her was a son-of-a bitch." Mr. Spaulding testified that he said to the defendant, that the court had made an order for the defendant to pay alimony in the divorce suit, and that his wife was in need of money; that the children were in the hospital; that she was out of a position, and had no funds; that he wanted defendant to pay her some alimony; that the defendant replied that he would not pay her any alimony; that Spaulding replied, that he would then have to cite the defendant into court, for failure to pay alimony; that the defendant replied to Spaulding that, "I'll kill her before you can get me into court." Spaulding immediately tele-

phoned police headquarters, and asked for protection for Mrs. Weiss. The defendant testified as to this conversation over the telephone, that when he had said to Spaulding what he intended to say to him, he dropped the phone, and, as he walked the floor, in his agitated condition of mind, his partner approached him and said, that he was sick and tired having Mrs. Weiss come around there, and if the defendant did not keep her away he would telephone the police to take her out. Almost immediately thereafter the defendant left his place of business and drove directly to Larimer street, where he purchased a gun, and five cartridges. Before his departure from the place of purchase he loaded his gun, bought a bottle of whisky, and then drove to the Edelweiss restaurant, where he had his dinner. From the restaurant he drove to the barber shop, and from thence to his wife's place of residence in North Denver, which he described as a very, very dirty, poverty-stricken place. Not finding her there, he returned to his room at the hotel. Later he sent a message to his wife, requesting her to call him at once at the hotel. Not long thereafter, at about 10 o'clock p. m., she arrived at the hotel. She declined his invitation to go to his room. He then asked her to ride around with him in his automobile. She acquiesced, and rode in the rear seat of his Ford sedan. Before leaving the hotel for the automobile ride he put on his overcoat, with his gun in the one pocket, and the whisky bottle in the other. He drove her to a remote, sparsely populated part of the city. They were quarreling during the ride. He took the bottle of liquor from his pocket, and drank. She struggled for possession of the bottle, and after securing it, poured its contents on the floor of the automobile, and then proceeded to search his pockets for more liquor, when she discovered his gun, and asked what that was. He told her, so he testified, that it was another bottle, to which she replied, "No, you have a gun, and are going to kill me," whereupon she leaped from the automobile, evidently in great terror,

and ran north on Columbine street, to its intersection with East Fifth avenue, where she turned westward, screaming in such a loud voice that it aroused the people of the neighborhood, who came out of their houses to ascertain the cause of the disturbance. By the aid of the street lights defendant was seen running at full speed, in pursuit of his fleeing wife, with gun in hand, and, when within eight feet of her, shot her in the back of the neck, severing the spinal cord, from which she died. Several persons and the police came upon the scene. The police officers took the defendant into custody. Immediately after the shooting witnesses heard the defendant say: "I have shot my wife"; "I have killed my wife"; "I have done finished my job"; "I have killed the son-of-a-bitch, she has played her last tune"; "I don't give a God damn, I shot her anyhow."

At police headquarters, on the night of the homicide, the defendant signed a written statement of the facts, at the suggestion of Mr. Segal, a deputy district attorney, in the presence of seven witnesses, from which statement we quote the following:

"She said she was going to leave the children and go to Europe. I lost my temper, and said, 'You son-of-a-bitch, you ain't going to go to Europe: You are going somewhere else.' Then I shot her, I don't know how many times. * * * I told her to keep away from my place, because she had embarrassed me by calling me up there. I don't love my wife, and I don't care for her. * * * For ten years I have threatened to kill her, and here lately I have often told her that I would shoot her if she didn't keep away from me. * * * I first made up my mind to shoot my wife when she told me that she was going to leave the country."

The defendant's daughter, Ida, eleven years of age, testified that she heard her father threaten to kill her mother.

There is still more criminating evidence in the record

than here set out, but this will suffice to show the sufficiency of the evidence to sustain the verdict of the jury.

Counsel for the defendant admits the killing, and that, under the evidence, the killing was felonious, but contends that the evidence does not justify the verdict fixing the penalty at death.

██ Under the Constitution, on a charge of murder, a trial by jury is imperative. Under the law, in such a case, the jury must determine the facts. No court can invade the province of the jury, and constitute itself the trier of facts. The jury is the sole judge of the credibility of the witnesses, and of the weight to be given to the testimony of each witness, including that of the defendant. In the instant case the jury has passed upon the credibility of the witnesses, and determined the weight of the evidence, and, having found the facts against the defendant, and the evidence as a whole being sufficient, as we have hereinbefore found, we cannot, under such circumstances, disturb the verdict of the jury.

██ A further contention of the defendant is, that the court erred in permitting the district attorney to cross-examine the people's witness, Blanchard. Five days after the homicide Blanchard made an affidavit for the district attorney in which he said: "I watched the man all the time, and from his actions it never occurred to me that he was drunk; he seemed perfectly all right, and sober, as far as I could see." On the trial, when called to the witness stand by the people, he testified that he smelled liquor, and noticed, from the defendant's actions, he appeared to be drunk. The district attorney, being thus taken by surprise, put leading questions to Blanchard, and the court permitted the district attorney, over the objections of the defendant, to cross-examine the witness with respect to these contradictory statements. There was no error in permitting the cross-examination under the circumstances here disclosed. To permit the district attorney to do so was clearly within the dis-

50

cretion of the court, and the defendant's rights were not prejudiced thereby.

■ Another contention is, that the court erred in allowing the district attorney to ask the defendant, on cross-examination, whether his wife showed any such indication of jealousy toward his women acquaintances before he stepped outside of his marital relations, and contracted syphilis; and also, in permitting the district attorney, in his closing argument, to comment on the defendant's moral dereliction with respect to such evidence. When the defendant exercised his right under the statute, to take the witness stand and testify in his own behalf, he elected to place himself in the same situation as any other witness. The defendant had previously testified in chief, at great length, reciting innumerable misdeeds of his wife, one after another, covering their entire married life, and, among other complaints made against her, recited her acts of jealousy of his women customers and acquaintances, for the purpose, no doubt, of exciting sympathy for himself in the eyes of the jury, and to engender prejudice, if possible, against the dead woman. The court permitted the district attorney to make the inquiry, upon cross-examination, to which objection is made, and the defendant, in answer to the questions on cross-examination, admitted that he had been unfaithful to his wife, and that he had contracted syphilis, and by such examination the district attorney was enabled to show the jury, that the defendant was the wrongdoer, and that the wife had reason to be jealous, because of his infidelity. We cannot hold, under these circumstances, that the cross-examination was improper or that the statements of the district attorney, commenting on the facts admitted by the defendant, constitutes reversible error.

■ Complaint is made that the defendant was prejudiced in the eyes of the jury by the question asked on cross-examination by the district attorney, to wit, "Did that nervous break-down have anything to do with the

raising of your father-in-law's check from $6.00 to $600.00?" The defendant admits that his objection to this question was promptly sustained by the trial court, but counsel contends that the court erred in failing to immediately instruct the jury, of its own motion, to disregard the same, notwithstanding counsel frankly admits, that he omitted to make such motion on defendant's behalf. We find no error here of which the defendant can complain. Furthermore, at the conclusion of the evidence in the case, the court instructed the jury that they were to consider only evidence given upon the trial, and that evidence offered upon the trial, and rejected by the court, should not be considered by them in arriving at a verdict.

The manner of the presentation of this assignment, and some others in the record, is not in accord with the rules and decisions of this court, but, nevertheless, in our consideration of the case, we have avoided invoking technical rules, and have carefully considered every assignment and objection made by the defendant's counsel, and, after a painstaking examination of the whole record, we are convinced, that the defendant had a fair and impartial trial, and that the evidence was abundantly sufficient to convince the jury of the defendant's guilt, beyond all reasonable doubt. We discover no reversible error in the record. The judgment is affirmed.

It is ordered, that the judgment be executed during the week commencing Monday, the 26th day of May, 1930.

MR. JUSTICE BUTLER not participating.