## No. 16,203.

### BERGER *v*. THE PEOPLE.
(224 P. [2d] 228)

Decided September 18, 1950. Rehearing denied November 13, 1950.

Mr. Isaac Mellman, for plaintiff in error.

Mr. JOHN W. METZGER, Attorney General, Mr. JOSEPH
E. NEWMAN, Deputy, Mr. RAYMOND B. DANKS, Assistant,
for the people.

*En Banc.*

MR. JUSTICE ALTER delivered the opinion of the court.

JOHN J. BERGER, JR. was charged with murder of the
first degree. The jury found him guilty of that offense
and imposed the death penalty. He was sentenced ac-
cordingly, and is here by writ of error seeking a reversal
of the judgment.

In the information it, was charged that on January 27,
1948, in the City and County of Denver and state of
Colorado, defendant did unlawfully, feloniously, wilfully
and deliberately, and of his premeditated malice afore-
thought, kill and murder one Josephine Berger.

Upon arraignment on February 10, 1948, defendant
entered a plea of not guilty and not guilty by reason of
insanity at the time of the offense, since and now. On
May 10, 1948, he withdrew his plea of not guilty by
reason of insanity theretofore entered, and on June 21,
1948, trial was begun on his plea of not guilty only. It
was concluded June 30, 1948, and on the afternoon of
said day the jury returned its verdict.

The undisputed evidence is that defendant and de-
ceased were married on January 29, 1940, and, as the
issue of this marriage, four children were born. Robert,
the eldest, was seven and one half years old at the time
of the trial. Prior to moving to Denver and subsequent
to their marriage, deceased and defendant resided near
Brighton, Colorado, on a farm. In June, 1947, defendant
was sentenced to a term in the state penitentiary upon
his conviction of fourth degree arson, and it appears
from the record that at the time he was being taken to
the penitentiary, when told that on good behavior his
sentence would be shortened and he would again be at

liberty, he stated that in such event he would only be out for a short period because it was his intention, upon his release, to kill his wife and his mother. He was released from the penitentiary on the morning of January 26, 1948, and en route purchased liquor, some of which he had in his possession when he arrived at his residence in Denver. The murder was perpetrated at sometime between the hours of 11:30 P. M., on January 26, 1948, and 3:00 A. M. on January 27, 1948.

The domestic life of defendant and deceased was marked by frequent quarrels, many of which resulted in defendant striking and brutally beating the deceased. Either at the time of the death of the deceased or prior thereto, a divorce action was pending. Defendant accused his wife of infidelity, and on at least one occasion brutally beat her and her alleged paramour.

Defendant arrived home after the evening meal and while his wife was washing the dishes. After the dishes had been washed, defendant and his wife were "fussing," and defendant then stated that he could get a better wife than was the deceased. After the children had gone to bed and before defendant and his wife retired, defendant drank some of the liquor remaining in the bottle which he had in his possession on arrival. At sometime during the night, and as definitely as is fixed by the evidence, at about 12:30 A. M., there was some commotion in the bed occupied by defendant and his wife, and he was seen choking her. Shortly thereafter defendant arose and poured some whiskey on his wife's face while she remained perfectly still and silent. Defendant again retired, and in the early morning awakened the children, stating that they were to go to Brighton to visit his father. At the time the children arose, their mother was still in bed, her face was bloody, and apparently she had not moved. Defendant and the children missed the bus, and returned to their home, the mother being still on the bed and apparently lifeless. One of the younger brothers, at the suggestion of Robert, accosted a passerby

and asked him to notify the police. In the meanwhile defendant had left home and was not there when the police arrived at about 8 o'clock and found the mother dead. Defendant was arrested at about 11 o'clock that morning and subsequently charged with murder and tried, the trial resulting as hereinbefore indicated.

On the discovery that Mrs. Berger was dead, the coroner was called, took charge of the remains, and also took some of the bedclothing which was stained by blood or other substance. An autopsy was performed and finding made that the death of deceased was due to asphyxia, resulting mainly from strangulation, was not due to natural causes, and was not self-inflicted. The coroner took stain specimens from defendant's clothing. An analysis of these stain specimens, as well as the blood and other substances found on the bedding, disclosed them to be the same as deceased's blood type, and wholly different from defendant's, a specimen of which he had voluntarily given and which had likewise been analyzed. While the plea of not guilty by reason of insanity was before the court, defendant was sent to the Colorado Psychopathic Hospital for observation, and, according to the testimony of a psychologist from that hospital, found to be sane. He was un-co-operative with the physicians there, and was sullen, bitter, antagonistic, hostile and mean. While at the hospital he denied that he had killed his wife, but stated that he felt that she was being unfaithful to him, and for this he had beaten her, and he thought that she deserved to be killed; that he felt neither sorrow nor remorse, but elation because of her death.

It is disclosed by the evidence that when defendant was drinking he was mean, brutal and pugilistic, as well as highly quarrelsome. He was frequently arrested because of treatment of his wife and others; served some short jail sentences; paid fines for this; and on two occasions prior to 1948, because of his excessive use of alcoholic liquors, was sent to the Colorado Psychopathic

Hospital for observation. At sometime prior to his conviction of fourth degree arson, and while employed, he sustained a back injury for which he received a considerable sum of money as damages, part of which, at least, he shared with his wife. So far as the record here reveals, this injury was very remotely, if at all, accountable for defendant's disposition. While he was serving his sentence in the Colorado Penitentiary, this back injury resulted in his being relieved of heavy work and light duties were assigned to him.

When defendant was questioned by the officers, after his arrest, he stated that his wife had helped dress the children for their visit to their grandfather, and that upon his return, after missing the bus, he found her gone from the home.

After the officers arrived at the home and found the murdered wife, a broadcast for defendant's arrest was made, and while he was at a bar he heard two officers inquire about a man whose description corresponded with his; thereupon he removed his jacket and an extra pair of trousers and left the bar, passing the officers, who did not recognize him as the man wanted. Prior to the incident just related, defendant had given his watch to a bartender for a pint of whiskey.

It is seriously contended that prejudicial error was committed in permitting Robert, the eldest son, to testify as to the occurrences in their home at the time of the homicide, from the time defendant returned thereto until the following· morning. When Robert was called as a witness, and on objection by defendant's counsel, the court, out of the presence of the jury, made an extended examination as to Robert's competency as a witness, and both counsel were given full opportunity to question him. In addition to the interrogation by court and counsel, a psychologist in the Mental Hygiene Clinic of the Colorado Psychopathic Hospital testified at length as to Robert's mental condition, and from her extended examination, reached the conclusion that Robert was

competent to testify. The court, as a preliminary matter, determined accordingly, and he was permitted to testify. During his examination as a witness he was so interrogated by counsel for both the People and defendant that the jury had a fair and reasonable opportunity to judge as to his competency as well as his ability to accurately relate the incidents occurring in the home at the time of his mother's death, and while there were some discrepancies in his testimony, they may be characterized as trivial, and, considering his age, reflect truthfulness rather than the contrary.

Defendant did not testify; however his counsel called several witnesses for the purpose of establishing a mental derangement in order to enable the jury to determine, in the exercise of its discretion, whether to fix the penalty at death or imprisonment for life should its verdict be guilty of murder of the first degree. Generally the witnesses testified that while defendant was not as quick and alert mentally as some other persons, nevertheless he could distinguish right from wrong, and, having made such distinction, was mentally capable of adhering to the right and refraining from the wrong. Other witnesses for defendant testified negatively that they had never seen defendant beat, strike or otherwise abuse his wife.

At the conclusion of all of the evidence, the court denied defendant's motion, which was: "If the Court please, the defendant desires to move at this time, at the conclusion of the evidence of all parties in this case, that the Court withdraw from the consideration of the Jury any question of death penalty herein, and that a verdict for such penalty be not submitted to the Jury. And as grounds for this motion, that no confession or admission by the defendant of the killing of the deceased Pauline Berger has been offered or admitted in evidence; and that the only evidence of an alleged eye witness to the said killing was the witness Robert Berger, the seven year old son of the defendant, who was incompetent to

testify as a witness at all, and whose testimony was so confused and contained so many statements in contradiction of all of the physical facts of the case as to be improper for consideration of the Jury, and insufficient upon which the Jury might base a penalty of death, and cannot find a conviction of first degree murder."

The record discloses the court's instructions were presented to counsel for examination and objections, if such there were, prior to instructing the jury, after which defendant's counsel stated, "At this time the defendant has no objection to the proposed instructions to be submitted to the Jury, no exceptions to the instructions to be submitted or offered."

After the receipt of the verdict, defendant filed his motion for a new trial, which was denied, and sentence was pronounced on the verdict.

The assignments of error are eighteen in number, but defendant's counsel has properly consolidated them, and they are presented under the following: 1. The verdict; 2. testimony of Robert Berger; 3. evidence of remote quarrels; 4. denial of right of cross-examination; 5. failure to instruct on voluntary manslaughter; 6. failure to instruct on mitigating circumstances.

1. and 2. It is the position of counsel for defendant that error was committed in the failure of the court to instruct the jury on circumstantial evidence, although admittedly no instruction on that feature was tendered or requested. He bases his contention on the statute (section 32, chapter 48, '35 C.S.A.) which concludes with the following proviso: "provided, that no person shall suffer the death penalty, who at the time of conviction, was under the age of eighteen (18) years; *nor shall any person suffer the death penalty who shall have been convicted on circumstantial evidence alone.*" (Italics ours)

This section 32 was section 2 of the amendatory act of 1901 (S.L. '01, p. 154), the only substantial change in the prior law being the proviso above quoted, for prior to

the amendatory act the death penalty could be inflicted either upon direct or circumstantial evidence. We have examined the record in many of the first degree murder cases determined by our court since the effective date of the amendatory act of 1901, and, except as hereinafter noted, have found none in which the jury was specifically advised that the death penalty might not be imposed. It is contended here for the first time, notwithstanding the fact that defendant's counsel expressly approved the instructions given the jury, and neither tendered nor requested others, and notwithstanding the motion for new trial did not include it, that the court's instruction defining murder in the first degree did not include the proviso, "that no person shall suffer the death penalty * * * who shall have been convicted on circumstantial evidence alone." and that this failure constitutes reversible error. It also should be remembered that no instruction on circumstantial evidence was given, tendered or requested; nevertheless it is here contended that the failure to give such an instruction constituted reversible error. Were it not for the seriousness of the case, and our imperative duty to safeguard the rights of every defendant, we might content ourselves by the statement that these questions are not properly before us, and, therefore, should be entirely disregarded.

The contention of counsel for defendant with reference to the instruction on murder and the necessity for an instruction on circumstantial evidence in every case is unique and one of first impression in this court. If counsel is correct, it follows that eminent counsel for defendant in criminal cases in this state have overlooked the point since the amendatory act of 1901; eminent trial judges have failed, for a period of fifty years, to properly instruct juries, and those of us now on this court, as well as others who have occupied that position since 1901, have failed to discover error and so determine. Many death sentences have been imposed where the circumstances of the case would appeal to one's sympathy

and fairness to a much greater extent than the facts in the present case warrant; nevertheless these considerations, collectively and separately, should not influence us in the discharge of our duty.

In the case of *Ausmus and Moon v. People,* 47 Colo. 167, 107 Pac. 204, the charge was murder of the first degree; the evidence was circumstantial only; there the verdict was guilty; and the jury fixed the penalty at life imprisonment. The record discloses that the court there instructed the jury, inter alia: "Under the law and the evidence no sentence of death could be inflicted in this case, and you are instructed that in the event you find either of the defendants guilty of murder in the first degree your verdict should fix the punishment to be inflicted at imprisonment for life. * * * " It there further instructed the jury on circumstantial evidence.

In *Bosko v. People,* 68 Colo. 256, 188 Pac. 743, George and Tom Bosko, brothers, the former over, and the latter under, the age of eighteen years, pled guilty to a two-count information in one of which they were charged with murder of one Hunter, and in the other with the murder of one Parks. A jury was impaneled as provided in section 32, supra, and before it there was direct evidence linking both defendants with the murder of Hunter. The jury returned its verdict of guilty, fixing the death penalty as to George, and as it was instructed to do in event of a first degree murder verdict against Tom, fixed the penalty as to him at life imprisonment, the statute so providing on account of his age. The only evidence linking defendants with the murder of Parks, as charged in the second count, was concededly circumstantial, and as to this count the court properly instructed the jury: "At the outset of your deliberations the Court instructs you that the People rely for convic-victions upon circumstantial evidence as to the killing, set out in the second count, to-wit: the killing of Elton C. Parks, and for that reason you cannot assess the death penalty under this count even though you may find the

defendants guilty of murder in the first degree." The court there also instructed on circumstantial evidence.

So far as our search has disclosed, there is no decision of this court to be found where there was both direct and circumstantial evidence before the jury with an instruction defining murder in the first degree and containing the proviso, supra, nor where there was direct evidence has there been an instruction also on circumstantial evidence in a first-degree murder case.

The decisions of this court disclose that in the following cases, covering two decades, we affirmed the judgment of the district court in death penalty cases, and in none thereof was any instruction advising the jury that the death penalty could not be inflicted if the conviction was based on circumstantial evidence alone. *Shank v. People,* 79 Colo. 576, 247 Pac. 559; *Maetas v. People,* 91 Colo. 36, 11 P. (2d) 227; *Catalina v. People,* 104 Colo. 585, 93 P. (2d) 897; *Pacheco v. People,* 96 Colo. 401, 43 P. (2d) 165; *Leopold v. People,* 105 Colo. 147, 95 P. (2d) 811; *Coates v. People,* 106 Colo. 483, 106 P. (2d) 354; *Martz v. People,* 114 Colo. 278, 162 P. (2d) 408; *Smith v. People,* 120 Colo. 39, 206 P. (2d) 826.

It is not intended by the citation of this list of our decisions to even suggest that if error was committed by us, we should continue therein; we should be the first to correct our mistakes, if such there be; the law should be settled and new construction should be made cautiously, and only after careful thought and mature deliberation. Our purpose in citing these decisions—and we could have extended the list over a period of fifty years — is to show an unbroken line of adjudications therein; no modification or deviation therefrom, and that, therefore, we should change this long and well understood line of decisions only when we are convinced of our mistakes and make public acknowledgment thereof. Until such conviction the rule of stare decisis should be followed.

If defendant's contention is correct, it would mean

that every instruction on first degree murder must contain the proviso, supra, and the jury must be informed that even though there is no question about age and it is admitted that the defendant is over the age of eighteen, nevertheless it must be instructed that if the defendant is under that age the death penalty cannot be imposed and likewise it must be told in every instruction defining first degree murder that a verdict finding the defendant guilty and fixing the death penalty cannot be returned where the evidence is circumstantial alone. As we have said, so far as we have learned from an examination of the records in many of the decisions of this court in the last fifty years, and since the enactment of section 32, supra, the proviso therein, with reference to age and circumstantial evidence, has not been included in the instruction defining murder in the first degree.

█ Robert's testimony was that of an eyewitness and was direct, as distinguished from circumstantial, evidence. Generally it may be said that direct evidence is such as establishes the existence of a material fact without indulging in any inferences or presumption. The determination as to whether evidence is direct or circumstantial is exclusively a prerogative of the court, while the weight to be given such evidence is likewise an exclusive prerogative of the jury. *Mitchell v. People,* 76 Colo. 346, 232 Pac. 685.

It, therefore, must be admitted that Robert's testimony was direct evidence. Nevertheless it is here contended that he was, on account of nonage, incompetent as a witness, and further that his testimony was susceptible of a construction that made it circumstantial evidence. With this last contention we cannot agree. We have examined the statutes on murder in every state in the United States, as well as the federal statute, for the purpose of ascertaining whether a statute similar to ours might be found, and, if so, the construction given it. As a result of our search we found that the murder statute

in Georgia was the only one that provided for a different penalty when the evidence was circumstantial alone. The Georgia statute provides: "The punishment for persons convicted of murder shall be death, but may be confinement in the penitentiary for life in the following cases: If the jury trying the case shall so recommend, or if the conviction is founded solely on circumstantial testimony, the presiding judge may sentence to confinement in the penitentiary for life." 6 Parks Annotated Code of Georgia, 4th Div. Art. 1, Sec. 63.

In *Shaw v. State*, 60 Ga. 246, defendant was found guilty of murdering his wife, and the death sentence imposed. It was there contended that the conviction rested upon circumstantial evidence which would authorize the court to modify the judgment to confinement in the penitentiary for life, but in the instructions to the jury it was said: " * * * That if they believed from the evidence that the defendant was guilty, he was guilty of murder, and no recommendation from them would be regarded, and that it could not affect the judgment of the court." It was therein stated that the only witness testifying to direct evidence was an ignorant, simple, weak-minded colored man who had made contradictory statements with reference to the facts on other occasions and when under oath. The syllabus, supported by the opinion, reads: "Where there was direct evidence of defendant's guilt, even though the witness who gave it was ignorant and weak-minded, and admitted to having previously made contradictory statements under the influence of fear, the court did not err in charging the jury that a recommendation to mercy would be of no avail."

It may be said that the present Georgia statute was amendatory of a previous statute, and the trial in *Shaw v. State, supra,* was before the enactment of the present statute. Granted this to be true, the previous statute and the present statute are very similar, and the amendatory statute changed provisions not important here.

■ As is indicated by the quoted motion of defendant's counsel, at the conclusion of all of the evidence, it is his contention that Robert's testimony should be wholly disregarded, and it is here now contended that it is susceptible of a construction as circumstantial, rather than direct, evidence. It should be noted that Robert's testimony was corroborated in every material respect. Robert said his father choked his mother; the coroner found that her death was occasioned by asphyxia due to strangulation. Robert said that his mother lay still and lifeless after the choking, and that the choking occurred about midnight; the coroner testified that the death occurred sometime between 11 P.M., on January 26, 1948, and 3 A. M., on January 27, 1948. Robert testified that when he and the other children and his father went to the bus, the mother was on the bed, still and lifeless, and when he returned she was still in the same position and condition. In our opinion there never has been a case brought to our attention where the circumstantial evidence was more persuasive and tended stronger to support the direct testimony than in the instant case.

We gather from the record that the objection to Robert's competency as a witness is based upon his youthfulness rather than his intelligence. Our statute provides in effect that children under ten years of age, who appear incapable of receiving just impressions of facts respecting which they are to be examined or who are incapable of truthfully relating these facts, shall not be witnesses. Section 8, chapter 177, '35 C.S.A. We have called attention to the fact that after an extensive examination out of the presence of the jury, with full opportunity given counsel to interrogate him, the court determined that Robert was competent and was capable of receiving just impressions of fact and truthfully relating the same. After the examination of Robert, in the absence of the jury, and with reference to his competency and qualification as a witness, the court said:

"The Court is of the opinion that this particular child is certainly capable of receiving impressions and communicating them in a fair and accurate manner. As to his credibility that correctly is, of course, a matter for the Jury to decide, and the Jury will, of course, be instructed on that particular matter as is the case with all witnesses.

"So far as the capacity to take an oath and to have a proper understanding of that, the Court is impressed with the opinion that this child probably possesses more than the average ability of a child of that age, and has perception of the difference between telling a lie and telling the truth. His answers to some of the questions were better answers than many of us adults might give.

"On that basis the Court finds that Robert Berger, offered as a witness for the State, age seven and a half years, is capable from the standpoint of observation, recollection and ability to communicate his thoughts, and of receiving just and accurate impressions, also competent from the standpoint of understanding the meaning and obligation of an oath, of knowing the difference between right and wrong, the obligation to state the truth as against a lie. On these findings the objections of the defense will be overruled, and the boy will be permitted to be sworn and to testify."

Objections similar to the one here interposed to Robert's testimony have been made and overruled in *City of Victor v. Smilanich,* 54 Colo. 479, 131 Pac. 392; *Holm v. People,* 72 Colo. 257, 210 Pac. 698; *Brasher v. People,* 81 Colo. 113, 253 Pac. 827; *Pillod v. People,* 119 Colo. 116, 200 P. (2d) 919; *Warren v. People,* 121 Colo. 118, 213 P. (2d) 381.

We conclude that no error was committed in permitting Robert to testify; that his evidence was direct, and upon it the jury might properly base its verdict, with the death penalty attached.

Defendant's counsel's further contention is that error was committed in permitting leading questions to

be propounded to Robert. This point apparently was urged rather strongly at the time of the hearing on defendant's motion for a new trial, and with reference thereto the trial court stated:

"As to leading questions, we have a number of decisions, and it seems to be the general rule that a child witness may be led to a limited extent. The Court was careful not to permit that to go any further than was necessary. The questions put by Mr. Danks, to which exceptions and objections were made and referred to in the motion for a new trial, were, in the opinion of the Court not without the proper scope of such examination, that the child was properly led to that extent; and that there again the answers which he gave were for the Jury to consider.

"The Court also was impressed with the other testimony brought out concerning the same point on cross examination. Some time had elapsed between the time of the direct examination, in which he referred to the choking, and between the cross examination by Mr. Wettengel, and there the witness reiterated and emphasized the statements which he had made on direct examination concerning his recollection of what had occurred, especially with regard to the choking of the deceased.

"It appears to me that the whole question of the boy's testimony boils down to the weight; and in view of the verdict of the Jury, apparently, the Jury decided he was telling the truth and that he remembered what had actually happened. For that reason the Court cannot consider the objections raised to any part of the testimony of the boy Robert Berger.

"I should add now, after hearing the testimony of the boy, the Court was more convinced than ever, the ruling on his competency to testify had been correctly made. That was the general impression I received from the testimony given by this boy witness."

In *Warren v. People, supra,* where it was urged that

the district attorney committed error in directing leading questions to children who were witnesses, we said: "But in cases like the instant one [indecent liberties], we have recognized a·wider latitude in asking leading questions—both because of the youth of the witness and the intimate nature of the questions. *Wills v. People,* 100 Colo. 127, 66 P. (2d) 329."

It is, so far as we have found, a universal rule that whether leading questions should be permitted is largely within the discretion of the trial court, and only in clear cases of abuse of that discretion will such permission be held to be reversible error.

■■ We conclude that in the trial of a murder case it is the duty of the trial judge to determine, as a matter of law, whether there is direct evidence supporting the charge, and when, and only when, the criminal responsibility is based on circumstantial evidence alone, does it become the duty of the trial court to instruct the jury that the death penalty cannot be imposed. In the trial of any murder case, where the prosecution relies in whole or in part on circumstantial evidence, if defendant's counsel desires an instruction on such evidence, it is his duty to prepare and tender such, and its refusal may constitute error. There was sufficient direct and competent evidence which would justify the verdict herein; Robert was a competent, qualified witness, the weight to be given his testimony being for the jury's determination, and the court did not commit error in permitting the prosecution to propound leading questions to the witness.

■ 3. The court permitted the introduction of evidence as to threats and other acts of violence directed toward deceased. To this evidence an objection was interposed on the grounds of its remoteness and prejudicialness. According to the record and evidence, the first act of violence occurred in September, 1943, at which time defendant called the deceased opprobrious names and struck her, and, as a result of this altercation,

the officers were called. There is testimony of another act of violence occurring in April, 1944, two days before a child was born to deceased, when defendant cursed and swore at deceased and had beaten her so that she was "bruised very badly, one eye black, nose swollen, ear partly jerked off on one side, had a big mark upon her neck." and the same witness testified that on January 26, 1946, defendant chased deceased out of their home at two o'clock in the morning, with snow on the ground, and that he was armed with a butcher knife which he threw at deceased as she entered the home of the witness, at which time defendant threatened both deceased and the person whose home she had entered.

There was testimony that in 1944 defendant, with no apparent provocation, cursed and struck deceased while she was seeking harbor in a neighbor's house. In November, 1945, a roomer in the Berger home heard deceased and her little son scream for help, and when she entered the room she found deceased on the floor and defendant beating her in the face; that shortly prior thereto, on another occasion, he swore and cursed decedent. One of decedent's sisters testified that in 1945 defendant struck decedent, whereupon one of her brothers came to decedent's rescue.

In July, 1946, a neighbor heard loud talking and saw defendant standing in the doorway of his home, his wife and three boys being outside, and that defendant had a knife in his hand and was threatening deceased and the children with it; that defendant started toward the wife and children, and chased them down the alley. There was testimony concerning other quarrels and altercations, with results similar to those above, all disclosing an intense animosity and hatred on defendant's part toward decedent. It also should be remembered that in June, 1947, when defendant was being transported to the state penitentiary, he remarked, when told that good behavior would shorten the time necessarily spent there, "If I get out I will be back in 30 days." and when asked,

"What do you mean?" he replied, "The first thing I do when I get out, get that wife of mine. * * * The second thing I do, get my mother." and when asked further what he meant by that statement, he replied, "I will kill them."

It should also be borne in mind that defendant stated to one of the witnesses that he wanted to be free from deceased and wanted her to divorce him, and to the same witness he stated that he thought the killing was a good thing; it was what she deserved, and he was not at all sorry about it, but rather glad that she was gone.

It is contended here, but with no authorities cited in support of the contention, that the admission of this evidence was prejudicial and was immaterial because too remote, but the following authorities from our own jurisdiction demonstrate conclusively that this contention is erroneous. *Davidson v. People,* 4 Colo. 145; *Babcock v. People,* 13 Colo. 515, 22 Pac. 817; *Van Wyk v. People,* 45 Colo. 1, 99 Pac. 1009; *Weiss v. People,* 87 Colo. 44, 285 Pac. 162.

In the present case the undisputed evidence discloses that defendant, from 1943 until January 26, 1948, continually and habitually mistreated the deceased, and, according to the evidence, it was his habit to brutally beat her whenever it pleased his fancy to do so. Evidence of these acts of cruelty was admissible for the purpose of showing motive and malice; the remoteness thereof does not destroy its admissibility and competency as evidence, but may tend to weaken its weight and effect in the jury's consideration.

4. Under this assignment defendant takes the position that the court denied him the right of cross-examination of his own witness and refused to admit certain exhibits. It will be remembered that defendant, prior to the trial, withdrew his plea of not guilty by reason of insanity prior to, at the time of, and subsequent to the offense charged. We are aware that, under our decision in *Ingles v. People,* 92 Colo. 518, 22 P.

(2d) 1109, evidence of insanity or mental derangement short of insanity is admissible, not for the purpose of acquittal, but to reduce the grade of the offense from murder of the first to second degree. It should be observed that the rule therein announced has been qualified, modified and somewhat limited by our opinion in *Battalino v. People,* 118 Colo. 587, 199 P. (2d) 897. Therein we clearly pointed out that under a plea of not guilty defendant might not raise the issue of insanity for the purpose of securing his acquittal of the charge, nor can the jury render a verdict finding defendant not guilty by reason of insanity. If it is determined in a proper proceeding, under a proper plea, that defendant was insane prior to and at the time of the commission of the offense, he cannot be tried for murder because he lacks the mentality to form an intent and purpose, and there would then be an absence of malice, premeditation, wilfulness and deliberation necessary in a first degree murder case, and insanity subsequent to the commission of the offense and at the time of the trial would deprive him of his God-given faculties with which to prepare and present his defense. When it is judicially determined that a man was insane at the time of the commission of an offense, he is not accountable under the law, and is not criminally responsible. In *Ingles v. People, supra,* it was held, and we so construed it in *Battalino v. People, supra,* that evidence of any mental ailment, abnormality or deficiency may be material to establish that defendant was incapable of forming and executing a purpose or executing an act with malice, deliberation and premeditation, without which a verdict of murder of the first degree could not be sustained. To make our position clear, we quote from *Battalino v. People, supra:* "In attempting to find a common thread of reason in these cases we reach the conclusion that the basis of admissibility of evidence as to insanity on the issue of the degree of homicide is not dependent on its relevancy to insanity as such, but rather on its relevancy

to wilfulness and deliberation in the killing. The question to be determined is not whether defendant was insane, but whether the homicidal act was committed with deliberation and premeditation. The evidence offered as to insanity may or may not be relevant to that issue."

After the defense had rested, the People called a Dr. Hirschberg, who had examined the defendant while he was under observation at the Colorado Psychopathic Hospital from February 16, 1948, to February 27, 1948, which, it will be noted, was subsequent to the commission of the offense charged. Dr. Hirschberg testified in part: "In our examinations of him [defendant], I feel there is no doubt whatsoever, as the result of our examinations, and as a result of our observations, Berger can tell the right from the wrong, he is able to adhere to the right and refrain from doing the wrong, and he is legally sane."

■■ Upon cross-examination defendant's counsel interrogated with reference to a recommendation by Dr. Busse, a physician at the Psychopathic Hospital, that defendant be sent to the insane asylum, and then on redirect examination it developed that this recommendation was based upon an examination of defendant in 1947, prior to being sent to the State Penitentiary on the fourth degree arson charge. Further interrogation elicited an answer that Dr. Busse's recommendation, made in 1947, was based upon chronic alcoholism. Dr. Busse was under a subpoena duces tecum issued on behalf of defendant, and was present in the courtroom part, if not all, of the time during the trial. After the People had completed their rebuttal evidence and rested, defendant's counsel called Dr. Busse as a witness for his client, and then interrogated him with reference to his examination of defendant in May, 1947, and because counsel claimed a surprise at his witness' testimony, he asked permission to cross-examine him. The surprise claimed by defendant's counsel arose in connection with

the following letter, on the letterhead of the University
of Colorado, under date of May 23, 1947, and reading:
"Honorable R. Boyd Garrison
 Adams County Judge
 Brighton, Colo.

In re: John Berger

Your Honor:
The above named patient was admitted to this hospital
5-13-47 on a complaint from Adams County. The patient
was previously in this hospital in 1944 at which time the
final diagnosis was chronic alcoholism. Patient was
taken from this hospital by his family against the advice
of the hospital physicians.

During his present hospitalization, he has been very dif-
ficult to handle. He is uncooperative, has become bellig-
erent and has attempted to escape from the hospital.
We feel that he will not benefit by treatment in this
hospital and that he will only get into more difficulty
if released. We therefore have no other alternative but
to recommend that he be placed before a lunacy com-
mission and transferred to the State Hospital at Pueblo."
This alleged surprise occurred because of the following
questions during Mr. Wettengel's direct examination:
"Q. Independent of that letter, or with that letter, Doc-
tor, can you state to us at this time whether or not you
recommended to the Judge of the County Court of
Adams County, in May, 1947, that this defendant be
placed before a lunacy commission and committed to the
State Hospital at Pueblo, as a chronic alcoholic? A.
That was my recommendation. Q. That was your rec-
ommendation? A. Yes, sir."

The letter of May 23, 1947, was then offered as an
exhibit, counsel stating that the offer was for the pur-
pose of impeachment. On objection the offer was re-
fused, the court stating that his refusal was based upon
the fact that "no surprise was occasioned which would
warrant cross-examination * * * and for the further
reason it was improper surrebuttal testimony." In this

we believe the court's ruling was correct. The letter of May 23, 1947, was hearsay and could only be used, if at all, for the purpose of impeachment. *Pomeroy v. People,* 116 Colo. 518, 182 P. (2d) 139. We also have held that before one may cross-examine his own witness there must be a definite showing of surprise (*Ware v. People,* 76 Colo. 38, 230 Pac. 123), and the record here utterly fails to disclose wherein defendant's counsel was surprised. If counsel desired to extend his direct examination and have the witness base his recommendation that defendant be sent to the hospital at Pueblo for other and additional grounds than chronic alcoholism, he made no such offer of proof, and the court had no occasion to pass upon the propriety of so doing. The court held the evidence improper in surrebuttal, and such holding was correct. *Turley v. People,* 73 Colo. 518, 216 Pac. 536.

 5. It is urged that under the evidence the court should have given an instruction on voluntary manslaughter and submitted a form of verdict which would have permitted the jury to find defendant guilty thereof.

"Manslaughter is the unlawful killing of a human being without malice, express or implied, and without any mixture of deliberation whatever. It must be voluntary, upon a sudden heat of passion caused by a provocation apparently sufficient to make the passion irresistible, or involuntary, in the commission of an unlawful act, or a lawful act without due caution or circumspection." Sec. 33, c. 48, '35 C.S.A.

"In cases of voluntary manslaughter there must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing." Sec. 34, c. 48, '35 C.S.A.

The most careful reading and consideration of this record fails utterly to disclose a scintilla of evidence which would remotely warrant the submission of an

instruction to the jury on voluntary manslaughter; furthermore voluntary manslaughter is entirely contra to the theory upon which the defense relied. The defense here was not guilty, by which the defendant specifically denied that he had committed the act of which he was accused, and the evidence clearly points to him as the perpetrator of a murder. Evidence also was introduced on behalf of defendant by which it was sought to have the grade of the offense lessened, and the death penalty avoided, the evidence relating to defendant's excessive use of alcohol, and also evidence that his mentality and criminal responsibility might be lessened because of an injury which he had sustained prior to the commission of the crime. As we have said, there is not a scintilla of evidence in the entire record which would have supported a verdict of guilty of voluntary manslaughter, and, under these circumstances, the court was not obligated to instruct thereon. *Jones v. People,* 93 Colo. 282, 26 P. (2d) 103; furthermore no instruction on voluntary manslaughter was tendered or requested, and, under such circumstances, even if such an instruction was proper, mere nondirection would not constitute error. *Winbern v. People,* 116 Colo. 136, 180 P. (2d) 516.

6. Defendant's counsel complains that the court failed to instruct the jury that it might consider all the evidence, including any mitigating circumstances, in arriving at its verdict. Under the record herein, it is impossible for us to find any evidence of any circumstances which might have been considered by the jury in mitigation of this offense.

The record consists of 1137 folios; the trial was begun on the 21st day of June, 1948, and concluded June 30, 1948; the jury deliberated less than three hours, found defendant guilty of first degree murder, and fixed the penalty at death. The cause came at issue in this court on the 27th day of March, 1950, and was assigned to the author about July 10, 1950.

The record considered, we are convinced that

the defendant had a fair and impartial trial and was properly convicted of the crime of murder upon evidence which established, beyond any doubt, his guilt. The trial judge was fair, impartial and careful in his rulings; the instructions given were expressly approved by defendant's counsel, and no others were tendered, or requested and refused, and the given instructions are not vulnerable to attack here for any cause. The attorney representing defendant in the trial court safeguarded his client's every right, but was woefully negligent in the discharge of his duties in this court, and, at our suggestion that other counsel be appointed, the trial court appointed Mr. Mellman to represent defendant on this review, and he has made every possible effort in his client's behalf by briefs which evidence careful and diligent study, thought and research. We have not been technical in our consideration of the record in this case, and have given it painstaking study and careful and deliberate thought, not only for the purpose of protecting the rights of defendant, as well as those of the public, but also that we might be conscious of the fact that our duty in the premises has been faithfully discharged. The situation in which defendant finds himself is one due entirely to his deliberate wrong-doing, and for which he has no one to blame except himself. It is the law that one who commits murder, as did defendant herein, must suffer the death penalty if imposed by a jury, and so long as this law remains on our statute books, it must, and will, be enforced.

The judgment is affirmed, and, since the week fixed by trial court during which it was to be executed has long since expired, this court now directs that the judgment be executed within the week ending November 18, 1950.

MR. CHIEF JUSTICE HILLIARD, MR. JUSTICE MOORE and MR. JUSTICE HOLLAND dissent.

MR. JUSTICE HOLLAND dissenting.

In dissenting to the majority opinion herein, I believe the following should be the opinion of the Court.

Upon a jury verdict returned June 30, 1948, by which defendant was found guilty of murder of the first degree, penalty was fixed at death; after motion for a new trial was overruled, sentence was pronounced, fixing the date of execution as the week beginning January 8 and ending January 15, 1949. Execution having been stayed, this writ of error assigned to the judgment is before us by the plaintiff in error, to whom I will refer as the defendant.

By an information filed January 30, 1948 by the District Attorney, the defendant was charged with the felonious killing of his wife on January 27, 1948 in the City and County of Denver. On arraignment, February 10, 1948, the defendant, after counsel was assigned, entered the plea of not guilty by reason of insanity at the time, since, and now. It was ordered that defendant be committed to the psychopathic ward at the Colorado General Hospital for observation for a period not to exceed thirty days. The record shows that on May 10, 1948 defendant, by his attorney, withdrew his plea of not guilty by reason of insanity and entered a plea of not guilty. Trial was had in due course, resulting in the verdict heretofore mentioned; motion for new trial was overruled, after which counsel then caused the record here presented to be prepared and filed in this court within the time allowed therefor. After lodging the record here, counsel failed to further prosecute this writ of error, and upon petition of the Attorney General, this court requested the trial court to assign new counsel for the defendant. There was a compliance with this request and present counsel accepted the onerous assignment, took the record as he found it, and we must notice his able presentation as it is now before us.

In reviewing this capital case, we are confronted with the unpleasant duty of not yielding to, or being controlled by, natural human sympathy, but to examine the

entire record "in favor of life" and to be certain, as far as certainty can exist in any such case, that defendant had, or will now have, all of the safeguards humanely provided by the law of the land, as well as that available through the inherent power of this court dictated in good conscience. To this end I set out salient parts of the record made from the testimony and rulings of the court.

The defendant, approximately thirty-one years of age, married the deceased January 29, 1940; deceased was twenty-nine years old at the time of her death; they lived about five years on a farm near Brighton, Colorado, and moved to 3763 Williams street, Denver, in 1945. They had four children, namely, Robert, John Frank, Richard, and Paula Jean. The oldest, Robert, was born October 18, 1940 and was at the time of the trial over seven years of age. In June, 1947, defendant commenced serving a sentence in the state penitentiary on a charge of fourth degree arson, and was released therefrom on January 26, 1948 at about 9:00 o'clock A. M. On that day, he started to his home.

Robert Berger, the oldest child, after a preliminary examination by the court out of the presence of the jury, was permitted to testify over the objection of defendant's counsel. According to his testimony, the defendant reached home shortly after dinner when deceased was washing dishes. Robert testified that he and his sister had already gone to bed in a small bedroom provided with twin beds and a small child's bed; that defendant threw some money on the floor for the children; took a drink out of a bottle that he had in his pocket and then placed the bottle on the dresser; that he heard his mother and father arguing about the father's drinking; that defendant said "he could get a better wife than she was." Robert slept with a brother in the twin bed close by a twin bed occupied by defendant and the deceased. In answer to a leading question (as I will later point out) Robert testified that he saw his father choke his mother;

that they were jumping up and down on the bed; that the hands of the clock were straight up and down apparently indicating 12:30 o'clock at night. All of the testimony in the case indicated that the lights were off in the room. Robert further testified that the defendant got up and walked around; poured some whiskey on deceased's face and then wiped it off; that deceased lay still and said nothing; that defendant got dressed, walked back and forth in the house, into the kitchen for a while and then undressed and came back to bed and got in bed with Robert for a while; that at about daylight, defendant aroused the children and told them he was going to see their Grandpa Berger at Brighton; he further testified that the children dressed themselves and helped each get dressed; that during all of this time deceased said nothing and was lying the same way on the bed; that there was blood on her face; and that defendant tried "to make believe she was alive." It was a very cold morning and they went out to get on the bus; defendant carried the youngest child, Paula Jean, and the three other children walked along; that the bus did not come; the younger children began to cry and defendant and the children returned home; then defendant left; the two older boys went into the house and found deceased lying on the bed with blood on her face and one of them, Frank, went outside and told Mr. Hanauer, a passerby, to call the police. Hanauer testified that he went down into the next block and placed a call to the police department. Dr. Angelo Lapi, medical examiner for the City and County of Denver, responded to the call and took charge of the body and later that day performed an autopsy and found that death was caused by asphyxia due to strangulation and was not superinduced or from natural causes; the time of death was fixed as between 11:00 o'clock P. M. on January 26 and 3:00 o'clock A. M. January 27. Several police officers promptly arrived at the scene. Defendant was arrested about 11:00 o'clock A. M. on that day near 47th and Williams street. The

suit coat he was wearing bore blood stains, which were later analyzed by Dr. Frances McConnell, clinical pathologist, as being made by the same type "O" blood as that of deceased.

When questioned at police headquarters, defendant stated that on his way from Canon City by bus, he purchased a pint of liquor at Colorado Springs and had some drinks and sandwiches at Palmer Lake; that he arrived home early in the evening; that he retired with deceased about midnight; that at about 4:00 o'clock he decided to take the children to Brighton; that with deceased's help, he dressed the children and he left with them, but when no bus came along and the baby started to cry, he returned home with the children and the deceased was not at home when he returned; that he left and bought a pint of whiskey and went to Ward's Hotel, where he overheard some police officers inquiring about a man dressed like him, so he removed a leather jacket and a pair of trousers that he was wearing over another pair; he then went out to catch a ride to Brighton, but was arrested by the police.

The People introduced testimony relating to prior threats and mistreatment of deceased. The defendant did not testify, but introduced evidence showing numerous prior arrests of the defendant; acts of violence by defendant toward the deceased and others; and his dissolute and profligate ways; he also introduced evidence showing a back injury received in 1946 and his commitment to the Colorado Psychopathic Hospital for observation on two occasions.

I will detail but little of the circumstantial evidence, which, from my examination of the record and considered as a whole, unmistakably points to the guilt of the defendant. Of course, however convincing this circumstantial evidence might be, if not supported by direct evidence, the death penalty cannot be imposed. My difficulty stems from parts of the testimony of Robert Berger, inconsistent in many details, but direct in part,

and said to be sufficiently direct to support the infliction of the death penalty. Due to the graveness of the situation, and not moved by any maudlin sympathy for the defendant, we should conscientiously consider this testimony, how it was obtained, how it was treated by the court, and the lack of caution to the jury in considering this possibly controlling part of the evidence. My care in the study of this important phase of the case is not pursued with the thought of a reversal of the jury's finding of guilt, but as it is appropriate to the question of the penalty of death or life imprisonment, which, by statute, rests in the jury's hands under proper instruction from the court. The part of the testimony of Robert Berger, the seven-year old witness, that is most direct and devastating to the defendant was his statement that he saw his father choke his mother. There is such a lack of continuity in other parts of his testimony that there is danger concealed in its consideration if used to inflict a death penalty. My search and study of the record does not reveal that the above statement of the child witness was voluntary. It came in response to a positive, leading question twice propounded to him before the answer, and, as shown by the record in the examination by the district attorney, as follows:

"Q. Did you say, Robert, your dad choked your mother, did you say that?

"Mr. Wettengel: He didn't say that. I object to that.

"Mr. Danks: My understanding he did say that at one point.

"The Court: The form of the question is objectionable. Objection sustained as to that. Proceed with your inquiry."

Then later in the examination, the district attorney, out of a clear sky again propounded the following question:

"Q. Bobby, did you tell the Court and Jury, did you tell us, Bobby, your dad choked your mother?

"Mr. Wettengel: I ask that the record be consulted.

It is not only an attempt to suggest and supply the answer, but he is trying to make the child say something he did not say. I challenge the record.

"The Court: He may ask whether this was true. I don't think the question in its present form is proper, whether he stated that, he may ask now whether that happened, not what he testified to. You may ask.

"Mr. Danks: Bobby, did you see your dad choke your mother? A. Yes.

\* \* \*

"Q. How did he choke your mother, what did he do? A. By his hands. Q. Where did he put his hands? A. Around her neck. Q. Did you see that, Bobby? A. Yes."

According to his other testimony, this was while the lights were off in the room. I am not unmindful of the rule permitting more or less leading questions to an infant, and that some latitude is indulged in that regard; however, this rule must be followed with caution and limitations where a death penalty is in the offing. It must be noted, and to me it is important, that this question was twice propounded, or in other words the answer was put into the mouth of the child before the answer. The seriousness of the effect of this statement will not permit me to say that it was voluntary and came from the lips of the child wholly uninfluenced by what had been said in his presence by the district attorney. In a measure, this statement was partially refuted by the medical examiner as to the possible details of how the strangulation took place. It might have been a sufficient variance to have caused the jury to largely discount the testimony of the child and rely more, or entirely on the circumstantial evidence. At this point I say that no instruction on circumstantial evidence was given to the jury, and I hold that for discussion later in this opinion.

A number of lay witnesses, who were intimately acquainted with the defendant, testified that over a period of years the defendant acted queer, was not all there, and in their opinion was not sane. This mental condition

was shown to be aggravated by excessive drinking on the part of the defendant which had continued for a long time prior to his plea of guilty to the charge of arson, which occurred under strange and peculiar circumstances and for which he served a short term in the penitentiary. It is definitely established by the evidence that defendant had been twice sent to the psychopathic ward of the Colorado General Hospital for observation. The last of these two occasions was in May of 1947. When the defendant was directed to be sent to the psychopathic hospital for observation by the County Court of Adams county, a report and letter was sent by the psychopathic hospital to the county court in the matter. At the time Dr. Cotter Hirschberg was testifying on behalf of the People herein as a psychiatrist, and in charge of the psychiatric ward when defendant was committed by the court to the ward for observation in the present case, counsel for defendant interrogated him concerning the matter of the records of the hospital on the previous occasion in May, 1947, just mentioned, and sought to identify the exhibits and the offer was rejected. The exhibit offered is marked Defendant's Exhibit #2 and is as follows:

"University of Colorado
School of Medicine and Hospitals
4200 East Ninth Avenue
Denver 7, Colorado
"May 23, 1947

"Colorado Psychopathic Hospital
"Honorable R. Boyd Garrison
Adams County Judge
Brighton, Colo.

In re: John Berger

"Your Honor:
"The above named patient was admitted to this hospital 5-13-47 on a complaint from Adams County. The patient was previously in this hospital in 1944 at which time the final diagnosis was chronic alcoholism. Patient was

taken from this hospital by his family against the advice of the hospital physicians.

"During his present hospitalization, he has been very difficult to handle. He is uncooperative, has become belligerent and has attempted to escape from the hospital. We feel that he will not benefit by treatment in this hospital and that he will only get into more difficulty if released. We therefore have no other alternative but to recommend that he be placed before a lunacy commission and transferred to the State Hospital at Pueblo.

"Sincerely yours,
"Ewald W. Busse
"Ewald W. Busse, M. D.
Senior Resident"

"ewb;bm"

This is a copy of the other offered exhibit which was the original. For surrebuttal, counsel for defendant called Dr. Ewald W. Busse, who was in charge of the psychopathic ward at the time of the commitment in May, 1947, and claiming surprise at the doctor's testimony, attempted to cross-examine him on the variance between his testimony and the exhibit, and upon objection, counsel was denied the privilege of further examining the witness. It appears that the matter upon which counsel desired to examine the witness was that in his testimony he fixed the condition of defendant as an alcoholic, while the offered exhibit, over the witness's signature, discloses that the witness recommended that defendant be placed before a lunacy commission and transferred to the State Hospital at Pueblo. I believe the ruling of the trial court in rejecting the exhibits, as well as the refusal of surrebuttal testimony in a capital case on the question of the mental condition to be considered in fixing the penalty, was serious error. According to the case of *Ingles v. People,* 92 Colo. 518, 22 P. (2d) 1109-12, the defendant, even though he had not relied upon a plea of insanity, was " * * * entitled to introduce evidence of insanity, or mental derangement short of in-

sanity, for the purpose, not of an acquittal, but of reducing the grade of the crime from murder of the first degree to murder of the second degree * * * " and further in the opinion, it is said, " * * * In determining whether the penalty shall be death or life imprisonment, the jury act in the exercise of a sound discretion. It is conceivable that the mental condition of a defendant at the time of the homicide may be such as to induce a jury in the exercise of their discretion, to fix the lesser penalty * * *."

It would be at the risk of great harm to exclude any evidence bearing upon the mental condition of the defendant, such as is unmistakably shown by the tendered exhibit, in May of 1947, as not being material as to his possible mental condition in January, 1948. This could easily have been the controlling feature of all the evidence in the minds of one or more jurors, or the entire jury, when it came to the question of considering the penalty to be inflicted.

In considering the matter of the guilt or the innocence of the defendant, I believe that it was the duty of the court, by proper instruction, to caution the jury concerning the testimony of Robert Berger, the seven-year old witness, not permitted to testify under the statutes except in sound discretion of the trial court after examination, especially in capital cases. This witness does not fall within the general class of adult witnesses whose credibility is to be determined by the jury under the guidance of the general stock instruction as to the credibility of witnesses. To so caution the jury does not come within the ban of emphasis by the court of the testimony of any particular witness, but due to the immaturity of the witness, it is only a guess on the part of the trial court as to the competence. This would in nowise lessen the effect of the testimony of the witness if the jury was directed to consider the age of the witness and the likelihood of imaginative impressions formed around and about an unusual and an extraordinary event. This cau-

tion would permit the jury, from its observation of the witness, to determine for itself the credibility, which, in the last analysis, is just as important as the discretion of the judge in permitting the witness to testify. This requirement is doubly important for consideration in fixing the penalty. The presumption against the capacity of a child seven years old to commit a crime is very strong and the same reason should apply to the possible effect of a child's testimony in a capital case. The fixing of the penalty was a vital phase of this case, and in following the general rule, we should hold that it is the duty of the court, whether requested or not, to instruct the jury on every essential question and phase of the case suggested by the evidence and the circumstances connected with the trial. This suggested guidance by the court could easily have been the difference between life imprisonment or death as the punishment.

The same principle applies as to the failure of the court in this case to give an instruction on circumstantial evidence. The direct evidence in this case was obtained, as we have seen, by leading questions and is uncorroborated except by circumstantial evidence. The jury could easily have been more influenced by the circumstantial evidence than by the direct evidence so elicited. The throbbing question before us is not as to what part of the evidence satisfied the jury as to the guilt or innocence of the defendant, but what part thereof influenced them in fixing the penalty. The quantum of the testimony relied upon by the state was circumstantial, but no instruction was given the jury at all that the law provides, in substance, that the death penalty cannot be imposed on circumstantial evidence only. By the failure to give an instruction on circumstantial evidence, it was the equivalent of the court saying that "the testimony before you is direct."

As to the matter of determining the punishment, the only instruction touching on that phase is instruction No. 19 which contains the following: " * * * unless your

verdict should be guilty of murder in the first degree, in which event, in accordance with these instructions, you will fix the punishment at either life imprisonment or death." My reading of the instructions discloses no other reference to the possible penalty, and nothing in the way of guidance or a rule to follow in making the distinction between the two penalties. There should have been an instruction to the effect that the jury should consider all of the evidence, including any mitigating circumstances, and also consider any evidence of mental derangement in determining the penalty, in the event their verdict was guilty of murder of the first degree.

I could unduly lengthen this opinion by further discussion of these vital questions, but I am confident that sufficient has been herein pointed out to show that to uphold the imposition of the death penalty by the jury in its unguided deliberations is dangerous, if permitted to stand, as a precedent in such cases. The whole record is sufficiently satisfying to sustain the verdict of guilty of murder, but not to warrant the infliction of the death penalty. We therefore are confronted with further disposition of the case. Consequently, we should consider our power to modify the judgment, which I believe to be inherent when true justice so requires. To hold otherwise would be an impairment of the underlying and most salutary power with which this tribunal has confidently been entrusted by the people for the final and ultimate administration of justice. The distinct function of the administration has been vouchsafed to the judicial department, separate and free from encroachment by other departments of the government. It has been wisely provided that upon the failure or exhaustion of the judicial power, then executive clemency may be sought. First being conscious of our responsibility, we should measure up to the full, and not shift the burden to the executive department.

A modification of the judgment before us, from the

death penalty to that of life imprisonment, would not be an invasion of the pardoning power. The exercise of control over inferior tribunals and their judgments is in no way related to the powers of clemency invested in the executive department. The act is judicial and not executive.

It is for the legislative department to define what may be offenses against the person, property, or the public, and set a general standard for punishment. No one would dare contend that the legislature could anticipate all of the circumstances surrounding the commission of crime, and fix an inflexible standard for punishment. Considering in full the realities of life and the varied and complex relationships of people in life's intercourse, I must finally say that this function of the legislature is a general, and not an inflexible, standard.

We do not hesitate to affirm, reverse, or modify the judgment, or orders, of a trial judge and I do not find any logical reason to hold that the verdict of a jury has any more potency than the finding of a trial judge. Our power to set aside and reverse a judgment based upon a jury verdict is not questioned. The grant of this extreme power surely includes the lesser power, that of modification of a judgment when justice requires, as shown by the entire record of a case.

No limitation of the power to modify the judgment before us is to be found in the Constitution or the statutes of this state. The jury is not a body separate and apart from the court. It is a part of the court and a part of a combination of a judge and jury which constitutes the court. Our action in controlling the judgments of the inferior courts, embraces the power to modify. Our right to exist and to function as a court must ultimately rest upon our power to dispense fundamental justice. Modifying this judgment would be an act and an award of what we should determine to be justice. In our form of government, justice is imperative.

I have hereinbefore indicated that the errors men-

tioned were not sufficient to justify a reversal of the judgment based upon the verdict of guilt, and also have indicated that the entire record of so-called direct testimony, and circumstantial evidence points unmistakably to the guilt of the defendant. A reversal and remanding of this cause for a new trial after this lapsed period from the date of the offense could, in several ways, result in a defeat of ultimate justice. However, I am not satisfied that the jury, after its determination of guilt, was wholly unaffected by nonguidance and possible prejudice in their deliberations on fixing the penalty. On this question a reasonable doubt exists, and any benefit arising therefrom belongs to defendant. Therefore, in the exercise of our full judicial power, I am of the opinion that we should order that the verdict and judgment herein be modified, and that the penalty imposed be that of imprisonment for life.

MR. JUSTICE MOORE, dissenting.

For the reasons hereinafter briefly stated, I respectfully dissent from the majority opinion.

Our law very clearly provides that no person shall, "suffer the death penalty who shall have been convicted on circumstantial evidence alone." '35 C.S.A., c. 48, §32. It further provides that in cases in which an accused is convicted of first degree murder, the jury "shall fix the penalty at death or imprisonment for life."

There is ample circumstantial evidence disclosed in this record to sustain a verdict of murder of the first degree. However, no death penalty could lawfully be imposed if the jury relied for conviction upon this circumstantial evidence. There is not to be found the least suggestion in the court's instructions that there was any limitation of any kind whatever upon the right of the jury to impose a death sentence even though its verdict of guilty was based entirely upon circumstantial evidence.

Admittedly, the only evidence received upon the trial,

which is direct, as distinguished from circumstantial, evidence, was that given by the seven year old child, Robert Berger, who was permitted to testify. In view of the tender age of this witness, and the natural hesitancy that mature minds must have in placing firm reliance upon the impressions of children but a few steps removed from incapacity to testify, it is entirely conceivable that the jury in this cause disregarded the "direct" evidence of the little boy and placed their reliance upon the wealth of circumstantial evidence pointing with high persuasion toward the guilt of the defendant. The jury was not instructed that if the issue of guilt was thus decided, no death penalty could be inflicted. It erroneously was kept in complete ignorance concerning any distinctions between direct and circumstantial evidence, and thus was without essential, fundamental information, the possession of which was necessarily prerequisite to an intelligent assessment of a penalty consistent with the basic principles of law which authorize the taking of human life as a forfeit for crime.

The members of the jury could not possibly have properly discharged their legal responsibility with reference to fixing the penalty, in the complete absence of any instruction stating the limitations upon their power. Thus the jury could not act with full understanding concerning the law, for the simple reason that it was not given sufficient instruction upon which to act in full light.

It is no answer to the foregoing to assert that, when counsel for the defendant upon the trial (who does not appear in this court) failed to object to the instructions given, and tendered no instructions which would have correctly stated the applicable law, he thereby waived the right of his client that otherwise would have been absolute. Reliance on technical rules should not spell the difference between life and death. There are some fundamental essentials in court procedure which cannot be waived. One of them is that, whoever assumes to

exercise the right to put a convicted felon to death in the name of the law, shall not elect to order the death penalty unless, and until, there has been a full explanation concerning the limitations which the law places upon the exercise of the power to order death as a forfeit for crime. The law which authorizes the death penalty is of no greater weight than that which fixes limitations upon the power to inflict it.

No person should be put to death by order of a group of citizens serving as jurors who were uninformed concerning the legal limits of their power. This is true without regard to the fact that the accused may be a semi-moron, or a previously convicted felon, or abnormal, or despicable, vicious, or for other reasons an outcast in the eyes of men.

Since it is here admitted that the jury might well have determined the guilt of defendant wholly upon circumstantial evidence; since it is further admitted that the jury acted in the complete absence of information that the law placed limitations upon its power to impose the death penalty; since it is entirely possible that, had the legal limitations relating to imposition of death been known to the jury, a different result might have obtained; there should be a reconsideration of the question of the penalty to be exacted. Any jury which considers the question anew, should be fully informed concerning all matters affecting its right to order the death of defendant.

I am unable to agree, as contended by Mr. Justice Holland in his dissenting opinion, that this court has the power to reduce the sentence from death to life imprisonment. Our law places that power exclusively in the jury, subject only to the power of the executive to extend clemency.

While another jury, acting with full knowledge of the law, might see fit to fix the penalty at death, nevertheless it might also only adjudge imprisonment for life.

In my opinion the judgment should be reversed and

the cause remanded for further proceedings consistent with the views herein expressed.

MR. CHIEF JUSTICE HILLIARD dissenting.

Since the record, fully stated and analyzed in the dissenting opinions of Justices Moore and Holland, to which I subscribe, clearly indicates that the unhappy defendant did not have a fair trial, which is the only proper concern of reviewing ministers of justice, I join in dissenting from the court's opinion. But as to the respective orders of disposition suggested by the other dissenting justices, differing widely, I agree with that of Justice Moore which would direct the granting of a new trial, well within our province, rather than that of Justice Holland which would change the sentence from the penalty of death imposed by the jury, to life imprisonment at our hands, not permissible, as I am convinced.